1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ZULILY, LLC,

          Plaintiff,

    v.

AMAZON.COM, INC.,

          Defendant.

CASE NO.  2:23-cv-01900

**COMPLAINT**

**<u>DEMAND FOR JURY TRIAL</u>**

COMPLAINT

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

## INTRODUCTION

Amazon is the world's largest online marketplace. But it has achieved that distinction, and maintains it, through anticompetitive conduct that destroys its competitors and raises prices for consumers everywhere. Indeed, after extensive investigations, the Federal Trade Commission ("FTC") and seventeen states have concluded that Amazon has committed *per se* illegal antitrust violations and has abused its monopoly power as an online superstore to immunize itself from competition from all other online retailers. *Federal Trade Commission, et al. v. Amazon.com, Inc.*, No. 2:23-cv-01495-JHC (W.D. Wash. filed Sept. 26, 2023) ("FTC Compl."); *See also State of Cal. v. Amazon.com, Inc.*, No. CGC-22-601826 (Cal. Super. Ct. filed Sept. 15, 2022) ("Cal. Compl.").

Zulily, an online retailer dedicated to offering consumers low prices, is one of Amazon's victims. The FTC Complaint alleges that, since at least 2019, Amazon specifically targeted Zulily as an emerging online superstore. Amazon could not tolerate Zulily's "primary strategy" to offer consumers the "lowest price online" or its displaying Amazon's prices next to Zulily's to show consumers that Zulily's were better. FTC Compl. ¶343. But rather than compete on the merits, Amazon set out to "destroy" Zulily instead, by coercing third-party retailers and wholesale suppliers to agree to "price parity," i.e., to artificially raise Zulily prices at or above Amazon's, and to punish any sellers who cheated. *Id.* ¶¶276, 345. Punishments ranged from disqualifying a seller from the "Buy Box"—the mechanism most consumers use to buy an item or add it to their cart—to "total

COMPLAINT – 1

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

banishment from Amazon's Marketplace." *Id.* ¶269. For many sellers, these punishments, if carried out, threatened their very survival.

The plot against Zulily was part of Amazon's overall scheme to eliminate horizontal price competition among all online retailers marketwide; to make Amazon's prices appear—falsely—to be the lowest without Amazon having to really compete; and to groom consumers not to look anywhere besides Amazon for the best retail pricing.

The result is what Amazon intended: Zulily's suppliers, who could not afford to lose Amazon sales, had no choice but to abide by Amazon's price-fixing terms and were forced to (i) instruct Zulily to increase its list prices for the at-issue goods to be at least as high as Amazon's, (ii) pull the offending product(s) from Zulily, (iii) leave Zulily altogether; and (iv) sometimes not even contact Zulily. Indeed, in just one year's time, Amazon's conduct resulted in nearly half of the suppliers who sold to both Amazon and Zulily to end their relationships with Zulily.

After only a few months of being targeted by Amazon's exclusionary conduct, Zulily was forced to discard the "Best Price Promise" it made to consumers and to remove all Amazon price comparisons from its website—effectively abandoning its strategy to gain scale through discount pricing. The conduct has caused Zulily substantial revenue losses and reduced traffic to Zulily's website. It denies Zulily the scale necessary to compete in the market,

COMPLAINT – 2

"stifles [competition], deadens price competition, reduces output, and deprives the American public of lower prices." *Id.* ¶350.

Accordingly, Zulily brings this action under federal and state antitrust laws against Amazon, seeking damages and other relief as recompense for Amazon's anticompetitive conduct.

## JURISDICTION AND VENUE

1.    This Court has federal question jurisdiction (28 U.S.C. § 1331) over Plaintiff's federal-law claims and supplemental jurisdiction (28 U.S.C. § 1367) over Plaintiff's state-law claims.

2.    This Court has personal jurisdiction over Amazon because at all relevant times, Amazon did and does substantial business in or affecting the State of Washington, its principal headquarters are in Washington, it has registered with the Washington Secretary of State, and the injuries that have been sustained because of Amazon's illegal conduct occurred in the State of Washington.

3.    Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Amazon's principal place of business is in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

4.    Plaintiff Zulily, LLC ("Zulily") is organized under the corporate laws of the State of Delaware and has its principal place of business in the State of

COMPLAINT – 3

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

Washington. Zulily is an online retail marketplace for clothes, toys, and home decor, among other things.

5.      Defendant Amazon.com, Inc. ("Amazon") is organized under the corporate laws of the State of Delaware and has its principal place of business in the State of Washington. Amazon is the nation's largest online retailer selling almost all categories of consumer goods imaginable.

## BACKGROUND

6.      Amazon is the "everything store"—it is the largest online retailer in the United States offering a broad array of consumer goods across multiple product categories: books, clothing, home goods, pet supplies, toys, and more.

7.      Amazon sales account for more than 50% of all online retail sales revenue in the United States while Amazon's two closest competitors—eBay and Walmart—account for only 6.1% and 4.6%, respectively.

8.      Amazon is a retailer, selling goods itself on the Amazon platform directly to consumers, and it hosts other retailers ("third-party retailers") who sell their goods on the Amazon platform in exchange for paying Amazon fees.

9.      While Zulily does not host third-party retailers, Amazon and Zulily share and compete for relationships with many of the same merchants. For example, some merchants who sell products on Amazon as third-party retailers and/or sell products wholesale to Amazon also sell products wholesale to Zulily.

### Amazon Controls Merchants

10.      Although some of Amazon's third-party retailers also sell their

COMPLAINT – 4

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

products "off Amazon" (on their own websites and on other online stores), Amazon is critical to the survival of most third-party retailers.

11.    Almost half of Amazon's third-party retailers generate 81% to 100% of their revenues from sales on Amazon—making Amazon their most important distribution channel by far.

12.    According to California's Attorney General, a third-party seller explained: "We have nowhere else to go and Amazon knows it." "If we lose 90 percent of our sales because we get suspended from Amazon, the business ceases to exist, basically. It doesn't work basically anymore." *Id*. ¶42.

13.    Amazon is equally critical to wholesalers. Amazon sales account for 20% to 30% of all sales of third-party retailers and wholesalers (combined)—sales which cannot be replicated on non-Amazon channels.

14.    "As a well-known consumer electronics device brand that sells wholesale to Amazon reported, 'It would be very harmful to our business if we were to stop selling our products on Amazon.com. Not only do a large and growing proportion of our sales take place on Amazon.com, but a majority of our customers also are members of Amazon Prime. A substantial portion of our sales take place on Amazon.com. Indeed, as of the third quarter of 2022, approximately 75% of our online device sales in the U.S. take place on Amazon.'" *Id*. ¶40.

15.    An internal document of a competitor (or would-be competitor) of Amazon's reportedly says: "Amazon is not loved by sellers, but sellers are locked into their platform." "You have no choice but to make a deal with the devil." "You

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

are one notice away from being shut down and losing your livelihood." "Amazon doesn't care about you." "We want Amazon's competitor to win because they aren't bullies." *Id.* ¶44.

16.    One reason for the bad blood is that Amazon charges both its third-party sellers and its wholesale suppliers supracompetitive fees to deal with Amazon. The FTC and California's Attorney General allege that Amazon's fees are inflated and higher than the fees charged by most or all of Amazon's online marketplace competitors, including Walmart.com and eBay.com.

17.    It is not Zulily's standard business model to charge suppliers fees at all. Zulily buys products wholesale at bargained-for prices and suppliers are charged nothing by way of service or advertising fees.

18.    A third-party seller reported to California's Attorney General that "the total fees it incurs to sell its products on Amazon [50%] have increased over time, to the point where the margins it earns on Amazon sales are lower than the margins it earns on sales through any other channels." *Id.* ¶58.

19.    Merchants have no power to negotiate fees or other conditions of dealing with Amazon: "Amazon's power over online merchants is not just in sales, but also in the way that sellers are treated." The typical seller on Amazon "has zero bargaining power whatsoever in their negotiations with Amazon. Everything is take it or leave it. All of the bargaining power rests with Amazon." *Id.* ¶66.

COMPLAINT – 6

20.     Another seller reported that it has no ability to negotiate the terms of its relationship with Amazon, and Amazon "changes its policies for sellers regularly and with little notice." "As a company whose whole business is dependent on sales on Amazon, when Amazon makes a policy change with little to no notice, it dramatically impacts this seller's business in a negative way." *Id.* ¶67.

21.     But despite the bullying and the increasing expense of dealing with Amazon, Amazon's market power over merchants has only grown because merchants require access to Amazon's vast customer network.

**Amazon Controls Consumers**

22.     Amazon enjoys market power over online retail consumers—and in particular—over its 160 million Prime-member households.

23.     Prime members pay a flat membership fee (today $139/year) for free unlimited 2-day shipping. Roughly 96% of all Prime members are more likely to buy products from Amazon than any other online store, and 74% of all consumers go directly to Amazon when they are ready to buy a specific product.

24.     Prime households are particularly lucrative to Amazon, with over 55% of U.S. households with income over $75,000.[1] Amazon uses Prime Membership to increase customers' engagement and drive them to Amazon

---

1.     *See* Stephanie Chevalier, *Share of online consumers in the United States who are Amazon Prime members as of August 2018, by household income*, Statista (June 15, 2022), https://www.statista.com/statistics/610070/amazon-prime-reach-usa-income.

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

rather than online competitors. According to Amazon, Prime subscription fees "make[] subscribers feel as though they must make the subscription fee worth it by making more purchases on Amazon." Prime subscribers spend an average of $1,400 per year on Amazon, compared to non-Prime customers, who spend an average of $600 per year.[2]

25.    Even when Amazon raises prices or lowers its quality, Prime customers generally have not switched to competing sites.

26.    When Amazon, for example, reduced the value of its platform to consumers by eliminating organic searches and relying on paid advertisements instead, Amazon only gained market share.

27.    When consumer prices on Amazon increased because sellers had to pay for the ads and passed through at least some of the advertising costs to consumers, Amazon only gained market share.

28.    Indeed, an estimated 90% of Prime customers renew their membership and more consumers join Prime each year, spending increasingly more on Amazon than any other online store.

29.    Due to Amazon's misleading practices that condition Prime and other customers to believe that the lowest total prices are on Amazon, competing online retailers would have to be able to offer better discounts and/or better product selection to incentivize Prime customers to shop elsewhere. Amazon,

---

2.    Matthew Woodward, *Amazon Prime Statistics: Subscribers, Usage & Revenue 2023,* https://www.searchlogistics.com/learn/ statistics/amazon-prime-statistics/.

COMPLAINT – 8

however, has foreclosed that possibility through collusion and monopoly power abuses.

## AMAZON'S MONOPOLY POWER
## IN THE RELEVANT ANTITRUST MARKETS

30.     Amazon has monopoly power in the market for online superstores (the "Online Superstore Market"). *See generally* FTC Compl. ¶¶117–183. Online superstores compete for online consumer sales across multiple categories of new retail goods—through a unique set of features that increase efficiencies for shoppers, including custom delivery.

31.     Online superstores also compete for sellers (third-party retailers and/or wholesalers) that want to reach consumers.

32.     Amazon abused its monopoly power in the relevant market Amazon abused its monopoly power in the relevant market to, among other things, implement a conspiratorial scheme to eliminate retail price competition in online superstores and in all online retail stores across-the-board.

### A.     The Online Superstore Market

33.     ***The online superstore is a relevant product market with no reasonably interchangeable substitute.*** For consumers, it has no or low cross-elasticity of demand with any other shopping experience. The relevant market, for example, excludes:

  a.     Retail sales made offline, such as in brick-and-mortar locations that require shoppers to travel to a specific location

COMPLAINT – 9

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

with limited physical shelf space and a corresponding need to curate.

    b.    Online sales made on limited-selection or specialized stores that serve consumers looking for a specific product or category of products.

    c.    Online sales of perishable groceries.

34.    The features of online superstores that are not reasonably interchangeable with, and cannot be replicated by, brick-and-mortar stores are:

    a.    An "extensive breadth and depth of product selection," that cannot be replicated in a physical store, i.e., the available products span multiple categories (e.g., clothes, toys, home decor) and there are a range of different brands available within each category.

    b.    24/7 access to shopping with the ability to pause a "shopping trip" and return to it later when convenient.

    c.    "[S]ophisticated filtering and discovery tools" that enable shoppers to find the desired product(s) quickly and efficiently.

    d.    Easy comparison shopping, i.e., the ability to compare features and prices of similar products made by the same brand and/or by different brands without leaving the platform.

COMPLAINT – 10

e.  Historical data regarding individual consumer's prior searches and purchases used to provide repeat visitors with custom shopping experiences, i.e., tailored recommendations based on previously viewed items, past purchases and "reminde[rs]" that it is time to replenish a previously purchased consumable.

f.  Realtime shopping recommendations, including across product categories, based on items as they are browsed such as "Frequently Bought Together."

g.  Product research tools that may include ratings and reviews, text descriptions, photos and videos.

h.  An efficient checkout experience where a consumer's payment and shipping information is pre-stored for easy use.

i.  Shopping from home or anyplace else, including while traveling, on a laptop or mobile phone.

j.  On the other hand, brick-and-mortar shoppers can see and touch a product while browsing and can discuss choices with in-store employees.

35.  The following are examples of features of Online Superstores that are not easily interchangeable with, and cannot be replicated by, limited-selection online stores:

COMPLAINT – 11

a.   An "extensive breadth and depth of product selection," that is unavailable at limited-selection online stores. A single limited-selection online store cannot become a shopper's preferred destination for purchasing an array of products. And there are inefficiencies and increased shipping costs in visiting and purchasing from multiple limited-selection stores versus one superstore.

b.   Valuable cross-category consumer data that limited-selection online stores do not have. The data offers shoppers a more personalized shopping experience. Amazon attributed more than a billion in sales to this capability special to online superstores.

c.   Limited-selection online stores cannot make cross-category shopping recommendations.

d.   Limited-selection online stores do not offer easy comparison shopping across multiple brands and/or product categories.

e.   On the other hand, a limited-selection online store may offer greater expertise in a particular brand or product category, more reliability in terms of quality due to curation and/or screening for counterfeit goods or fake reviews, or an appeal to customer loyalty to purchase directly from a particular online store or brand for a particular product or product

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

type—including loyalty based on personal relationships or personal history with a brand.

36. The online perishable grocery category is properly excluded from the Online Superstore Market. Perishable groceries are foods that cannot be safely stored at room temperature, including fresh fruits and vegetables, meat and frozen items. For various reasons, this is a distinct business line that is not part of the relevant market.

    a. Perishable groceries that are delivered (and not picked up curbside, for example) are delivered at a particular time or during a particular time slot—often requiring the customer to be present at delivery for prompt storage.

    b. During packaging and delivery, perishable groceries require specialized storage and delivery facilities with refrigeration or freezing that serve a smaller geographic area.

    c. Competition for perishable grocery sales is more localized because quality and shelf life are seasonal and regional. Amazon generally sets regional prices for perishable grocery items, whereas online-superstore items compete nationally and usually have a single, nationwide price.

37. For sellers (third-party retailers and/or wholesale suppliers), the Online Superstore Market has no or low cross-elasticity of demand with any other online sales outlet. Primarily, this is due to the ability of online superstores

COMPLAINT – 13

to reach the most online consumers, the most lucrative online consumers, and the online consumers who are shopping across multiple retail categories at once who may (even inadvertently) discover a seller's product when shopping for another product—even in another product category.

38.     ***The relevant geographic market is the United States.*** Online superstores that serve consumers shopping for items for U.S. delivery generally do not compete for sales to consumers shopping for items to be delivered outside the United States.

39.     Consumers shopping online for items to be delivered within the United States generally make purchases from U.S. businesses and U.S.-facing online stores. For example, Amazon's online storefront for shoppers in the United States (Amazon.com) is separate from its storefront for shoppers in the United Kingdom (Amazon.co.uk). They offer different products, at different prices, under different shipping terms, and present unique search results and advertisements.

40.     Online superstores that primarily serve shoppers seeking delivery abroad offer a shopping experience tailored to each individual country: different currencies, prices, customs and border control conditions, and shipping terms.

41.     Industry participants identify competitors for U.S. shoppers separately from competitors that serve shoppers seeking items to be delivered to other countries.

42.     ***There is direct and indirect evidence of Amazon's monopoly power in the relevant antitrust market.***

COMPLAINT – 14

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

43.     Despite the already-inflated and increasing cost of doing business with Amazon, and despite sellers' dislike of Amazon's way of doing business, Amazon's network of third-party retailers and wholesale suppliers has only grown.

44.     Despite Amazon's reduced value to shoppers (e.g., by substituting paid ads for relevance-based search results), Amazon's customer network has only grown.

45.     Despite Amazon consumer prices growing increasingly higher (e.g., as sellers pass through the increasing cost of doing business with Amazon to consumers), Amazon's customer network has only grown.

46.     Amazon's ability, through the illegal scheme alleged here, to artificially raise the prices charged on Amazon ***and*** the prices charged by its online superstore competitors establishes Amazon's monopoly power in the relevant market.

47.     Additionally, the FTC has concluded that—based on "documents and data, both from Amazon and industry analysts"—Amazon's share of the overall value of goods sold by online superstores is higher than 60% and rising. FTC Compl. ¶166.

48.     Gross Merchandise Value ("GMV") measures the total sales value of goods sold to customers during a given time and is commonly used to track the market share of online stores. Amazon's GMV captures the total value of goods

COMPLAINT – 15

sold on the Amazon platform—by Amazon as a retailer or by third-party retailers.

49.     The FTC cites third-party reports that assess market share across the "top-4 general merchandise platforms," i.e., Amazon, Walmart, Target and eBay, Amazon has maintained an estimated market share of more than 69% of GMV since 2015, with that share growing to 77% as of 2021. *Id.*

50.     Other data cited by the FTC puts Amazon's market share at more than 82% of GMV in 2022.

51.     Amazon's internal documents reportedly put its own market share at 72.5%, even if the market were to include stores that lack the breadth and/or depth of online superstores.

52.     ***Amazon's dominant share in the Online Superstore Market is protected by significant barriers to entry.*** Chief among them is scale—made all the more difficult to achieve given Amazon's network effects. There are also reputational barriers, switching costs, and feedback loops.

53.     The FTC alleges that scale is a "critical factor for success" in the Online Superstore Market. "Amazon itself has touted its scale as a key differentiator from medium-sized or single-category online stores." Jeff Bezos, Executive Chairman of Amazon, wrote that "online selling (relative to traditional retailing) is a scale business characterized by high fixed costs and relatively low variable costs. This makes it difficult to be a medium-sized e-commerce company," and "difficult for single-category e-commerce companies to achieve the

COMPLAINT – 16

scale necessary to succeed." According to Mr. Bezos, "building an important and lasting company in e-commerce" simply "isn't going to work in small volumes." *Id.* ¶177.

54.     In a market with network effects, the value of the service increases as more people use it. For example, the more consumers who shop on Amazon, the more valuable the platform becomes to merchants. The more consumers leave reviews for products on Amazon, the more useful the platform becomes to other shoppers. As with other network effects, the more scale an online superstore gains, the more powerful this effect becomes. Prospective and emerging entrants lack the network effects that contribute to scale.

55.     Reputational barriers require prospective and emerging entrants to establish a relationship of trust with customers to compete.

56.     Switching costs are a barrier to entry in the Online Superstore Market. Mr. Bezos has stated that "switching costs long-term should actually be higher in the online world than in the physical world" because "in the online world, businesses have the opportunity to develop very deep relationships with customers, both through accepting preferences of customers and then observing their purchase behavior over time, so that you can get that individualized knowledge of the customer and use that individualized knowledge of the customer to accelerate their discovery process." *Id.* ¶182.

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

57.     Finally, Amazon engages in the illegal conduct alleged here that bars entry and forecloses competition, making it very difficult for would-be competitors to enter and/or expand in the Online Superstore Market.

58.     At least in part due to these barriers to entry, there are few competitors or potential competitors in the relevant market: Amazon, eBay, Walmart and Target are the "big 4."

59.     Zulily also competes in the relevant market as an online retailer offering a "breadth and depth" of product selection that cannot be replicated in a physical store and that limited-selection online stores lack. The products available on Zulily span multiple categories, including clothes, beauty, toys, home decor, and electronics. FTC Compl. ¶158.

60.     The FTC identified Zulily as an "emerging" competitor in the relevant market since at least 2019.

61.     Amazon, too, recognized Zulily as an emerging competitor in the relevant market around that same time, as Amazon started scraping Zulily to check its pricing and punishing suppliers whose products were being offered on Zulily for prices that Amazon did not like.

**B.     Online Retail Product Markets**

62.     Amazon's anticompetitive conduct is not confined to the Online Superstore Market. It extends to essentially every online retail market that Amazon participates in. Zulily competes in many of these same markets and has

COMPLAINT – 18

been harmed by Amazon's anticompetitive conduct and agreements in those markets.

63.     Government agencies, economists, customers and retailers alike recognize online retail markets as distinct from the U.S. retail market. Industry recognition of distinct online retail markets is relevant because economic actors usually have accurate perceptions of economic realities and the parties active in the market understand its function and demarcation.

64.     For example, the U.S. Census Bureau and Bureau of Labor Statistics each separately define, track, and report on online retail markets.

65.     Retailers also recognize online retail markets as a separate economic reality. Most small retailers do not sell online. Online retailers commonly advertise only online, whereas brick-and-mortar retailers advertise both online and through other means.

66.     Online retail markets have unique characteristics, including superior methods for transmitting information, effective asynchronous communication, and greater interactivity and search capability. Online retail markets also have unique cost savings relative to brick-and-mortar retail markets, due to lower transaction costs while supplying goods directly to a consumer.

67.     The shopping experience in online retail markets is substantially different as well. For example, online shoppers can more easily compare prices, consider alternative products, and delay purchases until they are ready to buy.

COMPLAINT – 19

However, online shoppers cannot pay through cash or check. Customer service in online retail markets is different as well, as it is typically less comprehensive or effective without live employees to interact with.

68.     While discovery may reveal additional relevant markets, Zulily has suffered anticompetitive harm in at least the following online retail markets: women's clothing; beauty and wellness; home and garden; children's clothing; baby and maternity; footwear; toys and games; men's clothing; and electronics.

## AMAZON'S ANTICOMPETITIVE CONDUCT

69.     One reason why Amazon enjoys monopoly power is Amazon's price-fixing agreements. Zulily and other competitors generally cannot win customers from Amazon with lower prices because Amazon has developed a system to fix retail prices across all online superstores and other online retailers so that the prices listed on Amazon are always the lowest, though still supracompetitive. That horizontal price-fixing effect is Amazon's overall objective.

70.     Indeed, Amazon could suppress online retail price competition only by price fixing with its third-party retailers and its wholesale suppliers—but all with the same intent to price-fix at the retail level.

71.     Some Amazon wholesalers, for example, sell off Amazon at retail. Notably, Amazon did not limit its price-fixing agreement with wholesalers to cover only wholesale pricing: it fixes price at the retail level. Wholesalers then affect retail prices off Amazon by imposing minimum-advertised-price agreements—all in compliance with Amazon's retail price fix.

COMPLAINT – 20

72.     Similarly, some of Amazon's third-party retailers sell wholesale off Amazon, including to Zulily. To fill this potential gap in its price-fixing scheme, Amazon's price-fixing agreements with its retailers broadly prohibit ***any products*** that are being sold on Amazon from being sold off Amazon at prices that Amazon thinks are too low—even if, off Amazon, the seller is playing the role of a wholesaler and not setting retail prices.

73.     The fact that Amazon strategically placed its price-fixing agreements, that cover online retail prices marketwide, into some contracts that are otherwise vertical does not immunize Amazon from *per se* liability.

74.     At least some of the conspiratorial agreements are between and among horizontally-situated firms—regardless of how the surrounding paperwork is styled—and the economic reality is what Amazon intended: the elimination of horizontal price competition.

75.     Amazon uses its invaluable access to Prime and other customers as a bargaining chip to induce third-party retailers and wholesale suppliers to participate in the conscious commitment to that objective.

**Price-Parity Retail Agreements**

76.     Amazon requires each of its third-party retailers to agree to set off-Amazon prices equal to or higher than Amazon prices.

77.     Historically, Amazon strategically placed these price-parity agreements in its Amazon's Business Solutions Agreement ("BSA"), a contract that every third-party retailer must agree to and comply.

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

78.     Each third-party retailer knows that all other third-party retailers must agree to the BSA and each has access to the terms of the BSA online through Amazon Seller Central.

79.     When the price-parity agreement was contained in the BSA itself and (fittingly) was called the "Price Parity Provision," it required third-party sellers to list their lowest price for any particular item on Amazon.

80.     The FTC alleges that sellers understood this to be an agreement—that sellers followed—not to list products off Amazon for a lower price than the price listed on Amazon.

81.     Even though Amazon eliminated the "Price Parity Provision," sometime in 2019, due to foreign antitrust proceedings where at least one regulator found that it resulted in artificially inflated consumer prices, Amazon has continuously enforced the same agreement with the same intent and effects in the United States.

82.     Sellers, for example, now agree through the BSA to Amazon's "Fair Pricing Policy." That policy provides that "Amazon regularly monitors the prices of items on our marketplaces, including shipping costs, and compares them with other prices available to our customers. If we see pricing practices on a marketplace offer that harms customer trust, Amazon can remove the Buy Box, remove the offer, suspend the ship option, or, in serious or repeated cases, suspending or terminating selling privilege." *Id.* ¶118.

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

83.   A merchant's goods being listed off-Amazon at prices below Amazon's is a "pricing practice[] . . . that harms consumer trust." *Id.*

84.   As with the Price Parity Provision, the Fair Pricing Policy prevents merchants from listing their goods at lower prices on other platforms, including other platforms that charge lower (or no) merchant fees.

85.   Through the BSA, each of Amazon's third-party resellers also agree to "Amazon Standards for Brands Selling in the Amazon Store" ("ASB"), i.e., to "maintain Amazon's standards for customer experience," including "price competitiveness." *Id.* ¶116. To Amazon, "price competitiveness" means that third-party retailers must keep off-Amazon prices higher than they otherwise would in a competitive market—to make Amazon's prices falsely appear to be "competitive" without actual competition.

86.   Through the BSA, each third-party seller also agrees to the "Seller['s] Code of Conduct," which requires sellers to "act fairly." While Amazon touts that sellers purportedly are "welcome" to advertise the "same pricing and discounts off-Amazon as they offer in our store," the Code also requires sellers to agree not to divert Amazon customers to other websites: "You may not attempt to circumvent the Amazon sales process or divert Amazon customers to another website."

87.   One obvious way to divert Amazon customers away from Amazon is to list lower prices off-Amazon—an option that Amazon forecloses.

COMPLAINT – 23

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

88.     Finally, there is a relatively new 2022 "Account Health Rating Policy," which "indicates [a seller's] risk of deactivation due to policy non-compliance . . . ." The rating is affected by a seller's compliance (or lack thereof) with price parity and the policy provides potential penalties for "cheating" or non-compliance.

89.     At least one seller has confirmed that even though Amazon got rid of the specific Price Parity Provision in March 2019, "the policy continued." Similarly, another merchant reported it "understands that Amazon maintains a strict policy"—to this day—"that a company may not sell a product anywhere, including on its own website, for a lower price than the company sells for on Amazon.com." Cal. Compl. ¶126.

90.     Importantly, when Amazon retired the Price Parity Provision from its BSA in 2019, Amazon chose not to inform retailers that price parity was no longer required. Amazon did not want its retailers to think that anything had changed, because nothing had: Amazon continued to require that off-Amazon prices remain artificially high.

91.     Ecommerce consultants, who are aware of Amazon's policies and the effect they will have on their clients' businesses, counsel their third-party seller (and wholesale supplier) clients not to offer or allow lower prices than are offered to Amazon, even where their clients might prefer alternatives.

92.     Such ecommerce consultants have confirmed that the cost to clients of selling on Amazon is higher than the cost to sell through any other online sales

COMPLAINT – 24

channel. Still, one such ecommerce consultant that has advised numerous Amazon third-party sellers recognized that the sellers must sell on Amazon to be successful in the ecommerce space.

93.     Ecommerce consultants have confirmed to the California Attorney General's Office that their clients would offer more selection and permit greater discounting off Amazon but for Amazon's price parity policies.

94.     In addition to communications facilitated by ecommerce consultants, other communications between and among third-party retailers and wholesalers about compliance with Amazon's price-parity agreements occur in the normal course. Third-party retailers, for example, communicate with (at least their own) wholesalers about how to comply with Amazon's agreement not to allow online retail price competition. Those wholesalers have the same discussions with other retailers to whom they supply—creating an interconnected web of communications about compliance with Amazon's price-fixing.

95.     There is a YouTube video created by a former Amazon executive (and current ecommerce consultant) instructing wholesale suppliers how everyone can comply with Amazon's price-parity agreements.

96.     Compliance with the price-parity agreements is not in the respective individual interests of sellers. One third-party retailer reported that it might charge higher prices on Amazon than prices on other sells channels in

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

order to offset the high Amazon fees that cause it to have lower sales margins on sales through Amazon than through any other channel.

97.    An ecommerce consultant, formerly a third-party seller, who advises sellers who also sell to Amazon's online competitors, including Walmart.com, eBay.com, and Wayfair.com, confirms that due to the lower cost to sell on these sites, the clients would like to offer lower pricing on them than they offer on Amazon, but that none will do so because it would result in the suppression of the Buy Box for their Amazon listings.

98.    California's Attorney General additionally alleges that third-party sellers (and wholesale suppliers) would offer lower prices and allow discounting on competing sites if Amazon did not demand price parity.

**Wholesale Minimum Margin Agreements**

99.    On the wholesale side, Amazon forces its suppliers to agree to "formalized minimum margin[s]," sometimes also called "wholesale price-parity agreements." Cal. Compl. ¶175. These agreements state that if Amazon lowers the on-Amazon price to "price match" an off-Amazon price, the wholesaler must make "true-up payments" to Amazon so that Amazon continues to make a "Guaranteed Minimum Margin." *Id.*

100.    The FTC has concluded that these agreements allow "Amazon to take control of pricing (and discounting) away from wholesaler suppliers. If the product of a wholesale supplier is offered for a lower price off Amazon, Amazon proactively lowers the on-Amazon price and then demands the seller make up

COMPLAINT – 26

the difference. This hurts sellers' profits, so the effect is not lower prices, but a disincentive to offer lower prices off Amazon." *Id.* ¶176.

101.   As the California Attorney General explains, "The result is straightforward" in that wholesalers do not allow the offending products to continue to be sold at competitive retail prices off Amazon, triggering a wholesaler's "true-up" obligation. *Id.* ¶177. Instead, the wholesalers impose a requirement on Amazon's competition to raise prices and/or the wholesalers remove the product from Amazon's competition altogether.

102.   Ultimately, the competing online store cannot use its efficiencies or willingness to accept a lower profit margin to attract customers and take market share away from Amazon.

103.   On top of these formalized agreements, Amazon also imposes informal or *de facto* price-parity agreements on wholesalers whereby Amazon and its suppliers jointly set profitability targets, and the suppliers agree to make true-up payments after the fact if Amazon fails to meet the target because of price-matching.

104.   A "former senior Amazon vendor manager who now operates an ecommerce consulting business advises Amazon suppliers on how to avoid the under-profitability triggers that lead to demands for true-up payments. He advises them to enforce minimum advertised price policies to ensure that their products are not sold elsewhere for a price that would be under-profitable for Amazon to sell at." *Id.* ¶185.

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

105.   According to an "industry executive," competitors of Amazon's—desperate to retain their sellers and suppliers—have created programs to address the ways in which everyone relevant is complying with Amazon's price-parity agreements. *See* FTC Compl. ¶323.

106.   Amazon's internal documents reportedly confirm that the minimum margin agreements caused suppliers to raise their prices marketwide, or enabled Amazon to raise its prices for their products because suppliers had to withhold them from competing retailers (i.e., removing the price-match trigger).

**Policing and Punishment**

107.   Amazon's policing of its price-fixing agreements shows its conscious and active role in organizing the collusion necessary to eliminate horizontal online retail competition.

108.   Amazon aggressively monitors market prices to punish any third-party retailers and/or wholesale suppliers who Amazon perceives to violate its price-parity or minimum-margin agreements by discounting below Amazon's prices.

109.   Amazon has a Competitive Monitoring Team that maintains an extensive price-tracking operation and constantly searches the internet for prices. Amazon estimates that this operation can detect any price change virtually anywhere on the internet within hours.

110.   When Zulily operated its Best Price Promise program (before Amazon's anticompetitive conduct forced Zulily to end the program), it monitored

COMPLAINT – 28

prices on Amazon and other large online retailers to ensure that it was offering the lowest price. In several instances, due to Amazon's close monitoring of Zulily's prices, Zulily engaged in real-time price wars with Amazon, with each retailer lowering its price to beat the other multiple times per day.

111.    Amazon systematically punishes third-party sellers when it detects a lower price on a competing online retail store. Amazon, for example, commonly deprives its third-party retailers of the "Buy Box"—the main (and practically only) mechanism Amazon shoppers use to make purchases.

112.    From the search results, such as are shown in Figure 1 for a search for "Global Cleavers," shoppers who click on one of the products will be brought to the "Product Detail Page." *Id.* ¶83. A sample "Detail Page" with a Buy Box is shown in Figure 2 below.



FIGURE 1, Search Results extract

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

113.   This takes the shopper to the "Buy Box," which is the box on the right side of the product detail page where a shopper can click "Add to Cart" or "Buy Now."  Amazon generally includes only one Buy Box on a product detail page, and Amazon decides which seller's offer to include in the Buy Box. When Amazon is the seller, "Sold by Amazon.com" will appear in the Buy Box.  When the seller is a third-party retailer, that seller's name will appear in the "Sold by" information in the Buy Box.

114.   If more than one third-party retailer is offering the same product (or "ASIN") at the same time, the offers that Amazon has not selected for the Buy Box are listed on the "All Offers Display." Shoppers can find the "All Offers Display" only if they click on a link shown beneath the Buy Box that shows other offers (e.g., New (8) from $197 & Free Shipping, as shown in Figure 2).

COMPLAINT – 30



FIGURE 2, Detail Page with Buy Box

115.   The vast majority of shoppers never visit the "All Offers Display" page, as shown in Figure 3, which does **not** allow shoppers to Buy Now, and instead requires that the item first be placed in their shopping cart.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23



FIGURE 3

24

25

26

116.    Instead, nearly 98% of Amazon sales are made through the Buy Box.

Thus, disqualifying a third-party retailer from the Buy Box spells disaster for a

27

28

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

company's Amazon sales. For many sellers, losing the Buy Box—and even the ability to qualify for the Buy Box—threatens the survival of their business.

117.   Yet, since 2019, Amazon has increased its use of "Select Competitor – Featured Offer Disqualification," or "SC-FOD"—an Amazon algorithm that automatically disqualifies a seller from winning the Buy Box if Amazon detects a price that is lower for that product on any online store that Amazon designates as a "Select Competitor."

118.   In addition to disqualifying sellers from winning the Buy Box, Amazon's punishments also include: moving the offending products so far down in search results that shoppers are unlikely to find them, excluding retailers from sponsored-products advertisements, excluding sellers from "recommended" lists, and/or erasing a product's price from view entirely, even if is the best available on Amazon.

119.   Not only that, Amazon has suspended particular product(s) or a seller's entire line of products from its online store, or even "banish[ed]" sellers from Amazon permanently. FTC Compl. ¶263.

120.   Amazon threatens sellers with punishment not only when their products are being discounted too much on other online stores, but also when sellers offer a different selection of products on other online stores, if they fail to meet the required inventory in-stock levels, or if they do not ensure that most of their products are Prime eligible.

COMPLAINT – 33

121.   For retail products that Amazon prices and sells itself (as opposed to the products sold by third-party sellers), Amazon uses its extensive monitoring capabilities to thwart price competition by detecting and deterring discounting, artificially inflating prices on and off Amazon, and depriving rivals of the ability to gain scale by offering lower prices. For these purposes Amazon also utilizes an anti-discounting program that it implements through yet another pricing algorithm, designed to deter other online stores from offering lower prices than those of Amazon's Retail products.

122.   When using this "first-party anti-discounting" algorithm, Amazon disciplines rivals by immediately mirroring, but not undercutting, prices. If the lowest price for a product sold by a monitored online store or marketplace seller increases (or the product goes out of stock), Amazon automatically increases its price to duplicate the new lowest price, whether that is a higher price offered by the same online competitor or marketplace seller it had been copying or a price offered on a different website. If Amazon detects a "lowest price" drop, Amazon automatically copies that move. And if the "lowest price" increases, Amazon automatically copies again without even considering whether it could earn more business by continuing to offer shoppers the lower price. *Id.*

123.   The policing and punishments function to ensure that nobody undercuts Amazon's listed retail prices.

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

**Amazon Specifically Targeted Zulily as a Threat to Amazon's Monopoly Retail Prices**

124.    At least as of 2019, Amazon recognized that Zulily was an emerging entrant in the online superstore market and was pursuing scale by offering shoppers "the lowest price online" for various products during limited-time "flash sales."

125.    As part of Zulily's "Best Price Promise" initiative, Zulily displayed its lower price alongside Amazon's higher price to prove to consumers that Zulily's price was better. The FTC calls this "a classic form of price competition that should flourish in a competitive market." FTC Compl. ¶344.

126.    But Amazon could not tolerate the price competition, so "it set out to destroy" Zulily, even though Amazon's U.S. sales volume was 100 times greater than Zulily's. FTC Compl. ¶345.

127.    Amazon actively punished sellers whose products were being sold on Zulily at prices below Amazon's. The FTC alleges that the punishments "quickly stopped many Zulily suppliers that were also Amazon sellers from offering lower prices on Zulily." Indeed, after just one year of being targeted by Amazon, Zulily lost nearly half of its suppliers that also had products listed for sale on Amazon, and those suppliers are still dwindling today. FTC Compl. ¶346.

128.    Zulily's suppliers informed Zulily that they lost the Buy Box because Zulily's prices were too low, and that they could not afford to lose their Amazon sales.

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

129.   A supplier of infant care products, for example, told Zulily that Amazon responded to Zulily's "Best Price Promise" by removing thousands of the supplier's products from the Buy Box, substantially reducing the supplier's Amazon sales.

130.   As another example, in November 2020, a supplier of beauty products asked Zulily if "there is a way you can increase the sale prices? I am receiving complaints from several of my online retail partners (especially the exclusive partner for the Amazon marketplace). . . . When Amazon detects a substantially lower price for the same item, Amazon will automatically reduce traffic and un-feature the item on Amazon. Thus, the sales on Amazon dropped significantly and my Amazon partner was not happy about this." Zulily pushed back, but the seller insisted, "I don't think I can allow deep discounts for selling [my] items [on] online channels anymore . . . . Can you please raise the prices to at least $29.98? . . . I am running into a much bigger issue if I can't solve this matter by next week." Ultimately, this Amazon third-party seller left Zulily altogether, precluding Zulily from accessing its products.

131.   In August 2021, a personal care electronics brand wrote Zulily, "Would it be possible to update the retail on the below [item] to $19.99 ASAP. . . . This is currently below MAP pricing. . . . Unfortunately we will need to have this sku removed if it cannot be increased . . . . This caused the amazon listing to be pulled down. We also need the [other item] updated to $36.95 in all colors." Zulily said no: "we have to be the lowest retail in the market." But the

COMPLAINT – 36

Amazon third-party retailer responded, "Unfortunately Amazon has implemented strict pricing requirements and they will remove any deals with lower pricing elsewhere. We are going to take an extremely big hit to revenue because of this and cannot afford for this to happen again. Previously we were ok to run lower than MAP pricing . . . , but moving forward we need all MAP pricing to be implemented for all skus."

132.   Zulily tried to work with this supplier to "hide" its prices until the customer added the product to the cart, but a few weeks later, the seller informed Zulily that was not enough to placate Amazon: "It looks like there is an issue here again with items being below MAP/price not hidden . . . . At this point [we] want[] to remove all deals and inventory until Q1 since this has happened several times and is causing a big disruption to the Amazon business . . . . [W]e . . . have no choice but to remove [our product] from Zulily unless they began to sell at or above MAP permanently going forward . . . . We simply cannot afford buy-box shutdowns on Amazon anymore."

133.   That Amazon third-party seller no longer supplies products to Zulily.

134.   Another Amazon third-party seller of apparel emailed Zulily in January 2020, complaining that "we have had almost 2000 skus suppressed on Amazon because of [lower prices on this competing retailer's site] . . . . Amazon has told us indirectly that [you are] the issue with all of their inactive skus . . . . As much as I dislike Amazon, and like [you], The fact is we sell more on Amazon

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

. . . . I'm left with [limited] options," including: "We will have to move up our price on [your site]" [or] "We have to stop selling our best selling styles to [you]."

135.    In another incident in January 2020, a housewares supplier asked Zulily to stop presenting Amazon price comparisons alongside its products. The reason: "Amazon is connecting that the same item is being sold for much less, and we are losing the buy box on Amazon. That results in barely any to no sales, on items we sold 100s before." The supplier said, "We are trying to figure out how to strategize going forward we keep having to remove items."

136.    In addition to punishing sellers, Amazon also used its anti-discounting algorithm against Zulily to foreclose future price competition. The algorithm quickly copied Zulily's prices and made Amazon's prices lower. In response, Zulily reduced its prices further, and Amazon's algorithm undercut them again. This resulted in "continuous price spirals," causing Zulily to drop products from its online store.

137.    Amazon internally acknowledged that its tactics against Zulily had worked:  reportedly observing a "consistent drop" in Zulily traffic.

138.    But Amazon's Vice President of Pricing told his team to "keep going" in an effort to eliminate price competition from Zulily entirely.

139.    The result: Zulily was forced to abandon its discounting campaign "against a giant sitting on monopoly profits." After a few months of enduring Amazon's conduct, Zulily eliminated the "Best Price Promise" program and

COMPLAINT – 38

removed all Amazon price-comparisons from its website—foreclosing Zulily from competing for consumer sales based on better retail prices.

## ZULILY'S ANTITRUST INJURY

140.    Zulily has suffered antitrust injury caused by the competition reducing effects of Amazon's conduct.

141.    Amazon's price-fixing agreements and exclusionary conduct requires Zulily merchants **not** to discount or otherwise offer low prices on Zulily, causing Zulily to lose profits, a substantial volume of consumer sales, and web traffic.

142.    By foreclosing retail price competition, Amazon also has prevented Zulily from gaining scale through discounted pricing. The FTC alleges that Amazon's conduct has made it "virtually impossible for rival online stores to gain any significant market share by providing customers with lower prices." Cal. Compl. ¶206.

143.    Amazon's price-fixing agreements and exclusionary conduct caused Zulily to lose profits, a substantial volume of consumer sales, and web traffic due to the loss of suppliers who had no choice but to pull products and/or stop dealing with Zulily entirely in response to Amazon's punishments and threats even though it is not Zulily's standard business model to charge merchants fees and merchants generally prefer working with Zulily over Amazon.

144.    That conduct also prevented Zulily from gaining scale. Without merchant scale, i.e., a wider selection of available products, it is increasingly

COMPLAINT – 39

difficult to gain consumer scale, and therefore, to compete in the online superstore market.

145.   Indeed, Zulily experienced rapid growth and growing market share for several years before it landed on Amazon's radar, at which point Amazon's anticompetitive conduct caused a sharp reduction in Zulily's sales.

## HARM TO COMPETITION

146.   The FTC alleges that Amazon's conduct has harmed competition to all rivals or potential rivals of Amazon's—not just Zulily. Without the ability to attract shoppers or sellers through lower prices, each of Amazon's rivals is unable to gain a critical mass of either shoppers or sellers despite needing both to compete against Amazon.

147.   Amazon's conduct has also caused substantial harm to consumers:

a.   In an open, competitive environment, rival online stores could attract more business by offering shoppers lower prices.

b.   Rival online marketplaces could attract sellers by charging them lower fees, allowing sellers to pass those savings on to shoppers via lower prices.

c.   Amazon suppresses this price competition through collusion and by wielding its monopoly power to prevent sellers and retailers from offering lower prices off Amazon effectively resulting in an inflated Amazon price becoming the price floor everywhere else online.

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

d.   Amazon suppresses quality, choice and innovation. Amazon's conduct limits the availability of products for customers to choose off-Amazon and prevents them from pursuing differentiated sales strategies tailored to the strengths and weaknesses of rival online superstores.

148.   Amazon's conduct harms third-party resellers and wholesalers who are locked into using Amazon while being threatened and charged supracompetitive fees to do so.

## INTERSTATE COMMERCE

149.   Amazon's activities as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Amazon sells goods online across, and without regard to, state lines.

## FIRST CLAIM
### Hub & Spoke Conspiracy to Restrain Trade – 15 U.S.C. § 1

150.   Zulily realleges and incorporates all previous paragraphs.

151.   Amazon orchestrated a hub-and-spoke conspiracy with the illegal object to restrain horizontal retail price competition among online superstores in all product categories.

152.   Amazon was the hub and organized a series of agreements with the spokes.

153.   The spokes can be divided into two categories: third-party retailers and wholesale suppliers. However, for purposes of Amazon's objective, i.e., to restrain retail price competition among online superstores and emerging online

COMPLAINT – 41

superstores, the fact that third-party retailers and wholesalers are somewhat differently situated, with respect to Amazon, is less important than the fact that Amazon deemed all of them necessary to restrain price competition for all products.

154.   Due to the consumer control Amazon uses as a bargaining chip, Amazon's third-party retailers agreed to Amazon's price-parity provisions and/or policies to raise off-Amazon prices to levels equal to or higher than Amazon prices with the objective to eliminate horizontal retail price competition. This comprises Amazon's agreements with the third-party retailer "spokes."

155.   Due to the consumer control Amazon uses as a bargaining chip, Amazon's wholesale suppliers also agreed to price-parity or minimum margin agreements to raise off-Amazon prices to levels equal to or higher than Amazon prices with the objective to eliminate horizontal retail price competition. This comprises Amazon's agreements with the wholesaler "spokes."

156.   To comprise the "rims," Amazon's third-party retailers tacitly agreed with each other to eliminate horizontal retail price competition.  Third-party retailers directly compete with each other within each relevant product market.

157.   Likewise, Amazon's wholesalers tacitly agreed with each other to eliminate horizontal retail price competition. Wholesalers directly compete with each other within each relevant product market.

COMPLAINT – 42

158.   Each third-party retailer (and wholesaler) knew that every other third-party retailer (and wholesaler) was reaching the same, or similar, price-parity agreement with Amazon with the object and effect of restraining online retail price competition.

159.   The third-party retailers acted against their individual interests in agreeing with Amazon to price parity and in complying with the agreement. Third-party retailers would prefer to be free to discount their products off-Amazon (to achieve scale or to unload unpopular or "end of the line" products, for example), to be less reliant on a single marketplace (particularly one that imposes oppressive terms and conditions of doing business), and/or to deal with non-Amazon suppliers as they choose.

160.   The same is true for wholesalers who would prefer to be free to discount their products off-Amazon (to achieve scale or to unload unpopular or "end of the line" products, for example), to be less reliant on a single buyer, and/or to deal with non-Amazon buyers as they choose.

161.   Third-party retailers communicated with one another, at least through ecommerce consultants, to ensure that other third-party retailers and wholesalers had agreed and were complying with the agreement to eliminate online retail price competition. Wholesalers did the same.

162.   Retailers and wholesalers also communicated with and through one another about complying with Amazon's agreement not to allow online retail price competition.

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

163.   The third-party retailers and wholesalers relied on the tacit "rim" agreements as important insurance against the risk that competitors would gain market share off Amazon.

164.   In this way, Amazon achieved a series of hub-and-spoke conspiracies affecting each separate retail product category. Adding all the conspiracies together, Amazon was able to suppress horizontal online retail price competition, including among online superstores. This is illegal *per se*.

165.   The scheme is illegal also under a quick look or rule of reason analysis.

166.   The scheme—taken in parts or as a whole—caused significant harm to competition. Third-party retailers and wholesalers raised their prices marketwide, and enabled Amazon to raise its prices for products by withholding them from competing retailers (removing the price-match trigger). This resulted in artificially inflated consumer prices and suppressed quality, choice and innovation.

167.   The scheme—taken in parts or as a whole—lacks any cognizable procompetitive justification. In any event, the anticompetitive effects substantially outweigh any conceivable procompetitive rationale.

168.   As a proximate result of Amazon's unlawful conduct, Zulily has suffered (and will continue to suffer) injury to its business or property in an amount to be proven at trial and automatically trebled.

COMPLAINT – 44

**SECOND CLAIM**
**Third-Party Retailer Conspiracy to Restrain Trade**
**15 U.S.C. § 1**

169.    Zulily realleges and incorporates all previous paragraphs.

170.    Amazon, an online retailer, agreed with each of its third-party retailers to raise off-Amazon prices to levels equal to or higher than Amazon prices. Amazon and its third-party retailers compete with each other horizontally for retail sales.

171.    The fact that Amazon strategically placed these agreements in contracts that are otherwise (arguably) vertical does not shield Amazon from *per se* liability. The motivating objective and intent behind each agreement—and all the agreements combined—was to affect horizontal retail competition.

172.    The obvious market realities are that the agreements did function, together with the wholesale price-parity agreements, to destroy horizontal retail competition marketwide.

173.    The scheme is illegal also under a quick look or rule of reason analysis.

174.    The conspiracy caused significant harm to competition. Retail prices were raised off Amazon, and Amazon raised its prices for products being withheld from competing retailers. This resulted in artificially inflated consumer prices marketwide and suppressed quality, choice and innovation.

175.    The conspiracy lacks any cognizable procompetitive justification. In any event, the anticompetitive effects substantially outweigh any conceivable procompetitive rationale.

COMPLAINT – 45

176.   As a proximate result of Amazon's unlawful conduct, Zulily has suffered (and will continue to suffer) injury to its business or property in an amount to be proven at trial and automatically trebled.

### THIRD CLAIM
**Wholesale Supplier Conspiracy to Restrain Trade**
**15 U.S.C. § 1**

177.   Zulily realleges and incorporates all previous paragraphs.

178.   Amazon and its wholesale suppliers agreed with each of its wholesale suppliers to raise off-Amazon prices to levels equal to or higher than Amazon prices.

179.   Although for purposes of sales made on Amazon, Amazon and its wholesalers have a vertical relationship, Amazon sometimes competes with its wholesalers horizontally (at the retail level) and Amazon understood that its wholesalers otherwise affect off-Amazon retail prices (through minimum-advertised-price agreements or by pulling product, for example).

180.   The objective and intent behind each agreement—and all the agreements combined—was to restrain horizontal retail competition.

181.   The market realities are that the agreements obviously functioned together, including with the third-party retailer price-parity agreements, to destroy Amazon's horizontal retail competition marketwide.

182.   The scheme is illegal under the *per se* rule, under a quick look or under a rule of reason analysis.

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

183.    The conspiracy caused significant harm to competition. Retail prices were raised off Amazon, and Amazon raised its prices for products being withheld from competing retailers. This resulted in artificially inflated consumer prices marketwide and suppressed quality, choice and innovation.

184.    The conspiracy lacks any cognizable procompetitive justification. In any event, the anticompetitive effects substantially outweigh any conceivable procompetitive rationale.

185.    As a proximate result of Amazon's unlawful conduct, Zulily has suffered (and will continue to suffer) injury to its business or property in an amount to be proven at trial and automatically trebled.

186.    The harm and damages of the conspiracy were exacerbated by the retailer conspiracy. Working together, the two conspiracies ensured, as Amazon intended, that retail competition among online superstores would be suppressed marketwide and that Zulily—and other online retailers—would be unable to gain the scale necessary to compete against Amazon.

## FOURTH CLAIM
### Monopolization of the Online Superstore Market
### 15 U.S.C. § 2

187.    Zulily realleges and incorporates all previous paragraphs.

188.    Amazon has monopoly power in the Online Superstore Market. Amazon's network of customers, third-party retailers and wholesale suppliers has only grown despite Amazon imposing supracompetitive merchant fees,

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

oppressive terms and conditions for merchants to deal with Amazon, and supracompetitive consumer prices.

189. Amazon's ability to artificially raise Amazon prices **and** the prices charged by its online superstore competitors, through the illegal scheme alleged here, is direct evidence of Amazon's dominance in the relevant market.

190. Amazon has at least a 60% share of the Online Superstore Market—a figure that is deceptively low given that Amazon's dominance is protected by significant barriers to entry. Chief among them is scale—a competitive advantage made very difficult to achieve by Amazon's network effects. There are also reputational barriers, switching costs, and feedback loops.

191. The Online Superstore Market has few competitors and entry and/or expansion in the market is forestalled by Amazon's illegal conduct.

192. Amazon has willfully acquired and maintained its monopoly power by engaging in an exclusionary scheme with the intent to destroy all price competition in the relevant market.

193. Amazon coerced its third-party retailers and its wholesale suppliers not to offer products on Zulily (or at any other online retail store) at prices below Amazon's.

194. Amazon imposed other oppressive contractual conditions on merchants that make it difficult—if not impossible—for them to do business with online retailers besides Amazon (e.g., required inventory in-stock levels).

COMPLAINT – 48

195. Amazon punished merchants who violate Amazon's rules—most importantly, by offering products off-Amazon, including on Zulily, at prices below Amazon's.

196. Amazon has used anti-discounting algorithms against Zulily (and others) with the anticompetitive intent of destroying Zulily so that Zulily will not be able to compete at all in the relevant market.

197. Each of these tactics unreasonably restricts trade or commerce in violation of Section 2 of the Sherman Act (15 U.S.C. § 2), and Section 4 of the Clayton Act (15 U.S.C. § 4).

198. There are no procompetitive business reasons for Amazon's conduct other than to eliminate price competition among online superstores.

199. Through its exclusionary conduct, Amazon has and will injure competition.

200. As a proximate result of Amazon's unlawful conduct, Zulily has suffered (and will continue to suffer) injury to its business or property in an amount to be proven at trial and automatically trebled.

## FIFTH CLAIM
### Attempted Monopolization of the Online Superstore Market
### 15 U.S.C. § 2

201. Zulily realleges and incorporates all previous paragraphs.

202. Amazon has at least a 60% share of the Online Superstore Market— a figure that is deceptively low given that Amazon's dominance is protected by significant barriers to entry. Chief among them is scale—a competitive

COMPLAINT – 49

advantage made very difficult to achieve by Amazon's network effects. There are also reputational barriers, switching costs, and feedback loops.

203.   The Online Superstore Market has few competitors and entry and/or expansion in the market is forestalled by Amazon's illegal conduct.

204.   Amazon had a specific intent to monopolize. This is evidenced by Amazon's internal correspondence, amongst other things, stating that its purpose in pursing an anti-discounting regime was to destroy competition from emerging competitors like Zulily who threatened Amazon's supracompetitive prices.

205.   Amazon engaged in exclusionary conduct to achieve this end. It coerced its third-party retailers and its wholesale suppliers not to offer products on Zulily (or at any other online retail store) at prices below Amazon's.

206.   Amazon imposed other oppressive contractual conditions on merchants that make it difficult—if not impossible—for them to do business with online retailers besides Amazon (e.g., required inventory in-stock levels).

207.   Amazon punished merchants who violate Amazon's rules—most importantly, by offering products off-Amazon, including on Zulily, at prices below Amazon's.

208.   Amazon has used anti-discounting algorithms against Zulily (and others) with the anticompetitive intent of destroying Zulily so that Zulily will not be able to compete at all in the relevant market.

COMPLAINT – 50

209.   Each of these tactics unreasonably restricts trade or commerce in violation of Section 2 of the Sherman Act (15 U.S.C. § 2), and Section 4 of the Clayton Act (15 U.S.C. § 4).

210.   There is a dangerous probability of Amazon achieving monopoly power given its already-dominant share in a relevant market protected by significant barriers to entry.

211.   Amazon's own documents evidence its belief that its exclusionary conduct probably would—and did succeed—in achieving greater market power for Amazon by destroying Zulily, e.g., stating that Zulily's traffic was suffering because of Amazon's conduct but that Amazon should "keep going" to eliminate Zulily completely.

212.   The probability of Amazon's success is further shown by Amazon's investment of significant money and resources in its anti-discounting regime against Zulily and others to ensure its efficacy.

213.   There are no procompetitive business reasons for Amazon's conduct other than to eliminate price competition among online superstores.

214.   Through its exclusionary conduct, Amazon has and will injure competition.

215.   As a proximate result of Amazon's unlawful conduct, Zulily has suffered (and will continue to suffer) injury to its business or property in an amount to be proven at trial and automatically trebled.

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

**SIXTH CLAIM**
**Violations of Washington State Antitrust Law**
**RCW § 19.86.030**

216.    Zulily realleges and incorporates all previous paragraphs.

217.    The First, Second and Third Count (above) each constitutes an independent violation of Wash. Revised Code § 19.86.030, which prohibits any "contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce."

218.    Amazon's hub-and-spoke conspiracies are unreasonable restraints of trade.

219.    Amazon's horizontal third-party retailer conspiracy is an unreasonable restraint of trade.

220.    Amazon's vertical wholesale-supplier conspiracy is an unreasonable restraint of trade.

221.    Each of the conspiracies affected interstate and intrastate commerce.

222.    Amazon's conduct is either *per se* illegal and/or illegal under a quick look or rule of reason analysis.

223.    Amazon's conduct caused significant harm to competition. Third-party retailers and wholesalers raised their prices marketwide, and enabled Amazon to raise its prices for products by withholding them from competing retailers (removing the price-match trigger). This resulted in artificially inflated consumer prices and suppressed quality, choice and innovation.

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

224.   Amazon's conduct lacks any cognizable procompetitive justification. In any event, the anticompetitive effects substantially outweigh any conceivable procompetitive rationale.

225.   As a proximate result of Amazon's unlawful conduct, Zulily has suffered (and will continue to suffer) injury to its business or property in an amount to be proven at trial and trebled.

**SEVENTH CLAIM**
**Violations of Washington State Antitrust Law**
**RCW § 19.86.040**

226.   Zulily realleges and incorporates all previous paragraphs.

227.   The Fourth and Fifth Counts (above) each constitutes an independent violation of Wash. Revised Code § 19.86.040, which prohibits any person "to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of trade or commerce."

228.   As set forth above, Amazon has monopoly power in the Online Superstore Market.

229.   Amazon has willfully acquired and maintained its monopoly power by engaging in exclusionary conduct with the intent to destroy all price competition in the relevant market.

230.   Alternatively, Amazon had the specific intent to control prices or destroy competition; engaged in predatory and anticompetitive conduct to accomplish the monopolization; and has a dangerous probability of success in a market where Amazon enjoys dominance and significant barriers to entry.

COMPLAINT – 53

231.   Amazon's conduct caused significant harm to competition. Third-party retailers and wholesalers raised their prices marketwide, and enabled Amazon to raise its prices for products by withholding them from competing retailers (removing the price-match trigger). This resulted in artificially inflated consumer prices and suppressed quality, choice and innovation.

232.   Amazon's conduct lacks any cognizable procompetitive justification. In any event, the anticompetitive effects substantially outweigh any conceivable procompetitive rationale.

233.   As a proximate result of Amazon's unlawful conduct, Zulily has suffered (and will continue to suffer) injury to its business or property in an amount to be proven at trial and trebled.

**EIGHTH CLAIM**
**Violations of Washington State Unfair Competition Law**
**RCW § 19.86.020**

234.   Zulily realleges and incorporates all previous paragraphs.

235.   Amazon has engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

    a.   Amazon has orchestrated a hub-and-spoke scheme to eliminate price competition among online superstores.

    b.   Amazon has colluded horizontally and vertically with its third-party resellers and its wholesale suppliers to eliminate price competition among online superstores.

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

c.      Amazon has imposed other oppressive contractual conditions on merchants that make it difficult—if not impossible—for them to do business with online retailers besides Amazon (e.g., required inventory in-stock levels).

d.      Amazon has punished merchants who violate Amazon's rules—most importantly, by offering products off-Amazon, including on Zulily, at prices below Amazon's.

e.      Amazon has used anti-discounting algorithms against Zulily (and other online retailers) with the anticompetitive intent of destroying Zulily so that Zulily will not be able to compete at all in the relevant market.

f.      Amazon has deceived the public to believe that Amazon offers competitively low prices when, in fact, Amazon has immunized itself from meaningful price competition.

236.    These acts impact the public interest. Amazon has engaged in unfair trade practices that are illegal under Washington State's antitrust statute RCW § 19.86.020.

237.    Amazon has also engaged in acts and practices that have the capacity to—and did—deceive a substantial portion of the public, i.e., by falsely representing to consumers that its prices are the lowest and/or competitive leading consumers to believe that they paid fair—and not artificially inflated—prices.

COMPLAINT – 55

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

238.   As a proximate result of Amazon's unlawful conduct, Zulily has suffered (and will continue to suffer) injury to its business or property.

## JURY TRIAL DEMANDED

Zulily demands a trial by jury of all the claims asserted in this complaint.

## REQUESTED RELIEF

Zulily respectfully requests the following relief:

A.   Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

B.   Adjudication that the acts alleged herein constitute monopolization or attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

C.   Adjudication that the acts alleged herein violate Washington State's antitrust and consumer protection statutes;

D.   Actual damages and treble damages, and such other relief as provided by the statutes cited herein;

E.   Pre-judgment and post-judgment interest on such monetary relief;

F.   Equitable relief requiring that Amazon cease the abusive, unlawful, and anti-competitive practices described herein (including pursuant to federal antitrust law (*see, e.g.*, 15 U.S.C. § 26);

G.   The costs of bringing this suit, including reasonable attorneys' fees; and

H.   All other relief to which Zulily may be entitled at law or in equity.

COMPLAINT – 56

Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858.964.4589

1

2   DATED: December 11, 2023         BONA LAW PC
                                      Jon Cieslak (*pro hac vice* forthcoming)
3                                     4275 Executive Square, Suite 200
                                      La Jolla, CA 92037
4                                     858.964.4589
                                      jon.cieslak@bonalawpc.com
5

6                                     BONA LAW PC
                                      James Lerner (*pro hac vice* forthcoming)
7                                     Molly Donovan (*pro hac vice* forthcoming)
                                      41 Madison Avenue #2509
8                                     New York, NY 10010
                                      212.634.6861
9                                     james.lerner@bonalawpc.com
                                      molly.donovan@bonalawpc.com
10

11                                    *Lead Counsel for Plaintiff*

12
                                           */s/ Mark Rosencrantz*
13                                    Mark Rosencrantz (WSB # 26552)

14                                    CARNEY BADLEY SPELLMAN, P.S.
15                                    701 5th Avenue, Suite 3600
                                      Seattle, WA 98104
16                                    206.622.8080
                                      rosencrantz@carneylaw.com
17
                                      *Local Counsel for Plaintiff*
18

19

20

21

22

23

24

25

26

27

28