UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| ZULILY, LLC; OLD RETAIL ABC, LLC, Plaintiffs, v. AMAZON.COM, INC., Defendant. | CASE NO. 2:23-cv-01900-JHC<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS |
| --- | --- |

**I**

**INTRODUCTION**

This antitrust matter comes before the Court on Defendant Amazon.com, Inc.'s Motion to Dismiss. Dkt. # 25. The Court has reviewed the materials filed in support of and in opposition to the motion, pertinent portions of the record, and the applicable law. The Court finds oral argument unnecessary. For the reasons below, the Court GRANTS in part and DENIES in part the motion. And the Court grants Zulily, LLC leave to file an amended complaint.

/

/

/

## II
## BACKGROUND

Plaintiff Zulily is an "online retail marketplace for clothes, toys, and home décor among other things." Dkt. # 1 at 4–5 ¶ 4. According to Zulily, Defendant Amazon "is the largest online retailer in the United States offering a broad array of consumer goods across multiple product categories: books, clothing, home goods, pet supplies, toys, and more." *Id.* at 5 ¶ 6. Amazon sells goods on its online platform and hosts third-party retailers who pay fees to sell their goods on the platform. *Id.* at 5 ¶ 8. Zulily does not host third-party sellers on its site, but "Amazon and Zulily share and compete for relationships with many of the same merchants." *Id.* at 5 ¶ 9. Zulily also says that some third-party retailers who sell their products on Amazon or sell their products wholesale to Amazon also sell their products wholesale to Zulily. *Id.*

Zulily alleges that "Amazon has monopoly power in the market for online superstores (the 'Online Superstore Market')." *Id.* at 10 ¶ 30 (internal citation omitted). "Online superstores compete for online consumer sales across multiple categories of new retail goods—through a unique set of features that increase efficiencies for shoppers, including custom delivery." *Id.* They also compete for third-party retailers and wholesalers "that want to reach consumers." *Id.* at 10 ¶ 31. Zulily says that it competes in the Online Superstore Market as an "online retailer offering a 'breadth and depth' of product selection that cannot be replicated in a physical store and that limited-selection online stores lack. The products available on Zulily span multiple categories, including clothes, beauty, toys, home decor, and electronics." *Id.* at 19 ¶ 59 (internal citation omitted). Zulily alleges that Amazon engages in "illegal conduct" that "bars entry and forecloses competition, making it very difficult for would-be competitors to enter and/or expand in the Online Superstore Market." *Id.* at 19 ¶ 57.

Zulily contends that nearly half of "Amazon's third-party retailers generate 81% to 100% of their revenues from sales on Amazon." *Id.* at 6 ¶ 11. Amazon's platform is also crucial to wholesalers; according to Zulily, "Amazon sales account for 20% to 30% of all sales of third-party retailers and wholesalers (combined)." *Id.* at 6 ¶ 13. Zulily says that Amazon charges third-party retailers and wholesale suppliers "supracompetitive fees" to sell their goods on Amazon's platform. *Id.* at 7 ¶ 16. It contends that Amazon's fees are "inflated and higher than the fees charged by most or all of Amazon's online competitors." *Id.* Zulily says that it does not charge "suppliers fees at all." *Id.* at 7 ¶ 17. It "buys products wholesale at bargained-for prices and suppliers are charged nothing by way of service or advertising fees." *Id.*

Zulily says that one of the ways Amazon has gained monopoly power is through price-fixing agreements with third-party retailers and wholesale suppliers. *Id.* at 21 ¶¶ 69–70. It says that "Amazon requires each of its third-party retailers to agree to set off-Amazon prices equal to or higher than Amazon prices." *Id.* at 22 ¶ 76. Up until 2019, Amazon imposed a "Price Parity Provision" that "required third-party sellers to list their lowest price for any particular item on Amazon." *Id.* at 23 ¶ 79. Now sellers must adhere to Amazon's "Fair Pricing Policy," which says,

> Amazon regularly monitors the prices of items on our marketplaces, including shipping costs, and compares them with other prices available to our customers. If we see pricing practices on a marketplace offer that harms customer trust, Amazon can remove the Buy Box, remove the offer, suspend the ship option, or, in serious or repeated cases, suspending or terminating selling privilege.

*Id.* at 23 ¶ 82. Third-party retailers also agree to "Amazon Standards for Brands Selling in the Amazon Store" program, which requires retailers to "'maintain Amazon's standards for customer experience,' including 'price competitiveness.'" *Id.* at 24 ¶ 85 (internal citation omitted). They must also agree to Amazon's "Seller'[s] Code of Conduct," which requires sellers to "act fairly" and "not attempt to circumvent the Amazon sales process or divert Amazon customers to another

website." *Id.* at 24 ¶ 86 (alteration in original). Zulily says that, in 2022, Amazon introduced an "Account Health Rating Policy, which indicates [a seller's] risk of deactivation due to policy noncompliance." *Id.* at 25 ¶ 88 (alteration in original). A seller's rating is affected by their compliance "with price parity" and the policy imposes penalties "for cheating or non-compliance." *Id.*

On the wholesale side, Amazon requires its suppliers to agree to minimum-margin agreements (MMAs). *Id.* at 27 ¶ 99 (internal citation omitted). These agreements state that if Amazon lowers the price of a product on its platform to "price-match an off-Amazon price" for the same product, then the wholesaler must make "true-up payments" to Amazon so that Amazon will still make a "Guaranteed Minimum Margin." *Id.* (internal citation omitted). Zulily says that Amazon also imposes an "informal" price-parity agreement on wholesalers in which "Amazon and its suppliers jointly set profitability targets, and the suppliers agree to make true-up payments after the fact if Amazon fails to meet the target because of price-matching." *Id.* at 28 ¶ 103. According to Zulily, these agreements "caused suppliers to raise their prices marketwide, or enabled Amazon to raise its prices for their products because suppliers had to withhold them from competing retailers (i.e., removing the price-match trigger)." *Id.* at 29 ¶ 106.

Zulily says that Amazon monitors market prices and punishes "any third-party retailers and/or wholesale suppliers who Amazon perceives to violate its price-parity or minimum-margin agreements by discounting below Amazon's prices." *Id.* at 29 ¶ 108. One common punishment is removing a third-party retailer's access to Amazon's "Buy Box."[1] *Id.* at 30 ¶ 111. According

[1] Amazon's "Buy Box" is a "box on the right side of the product detail page where a shopper can click 'Add to Cart' or 'Buy Now.'" Dkt. # 1 at 31 ¶ 113. According to Zulily, "Amazon generally includes only one Buy Box on a product detail page, and Amazon decides which seller's offer to include in the Buy Box. When Amazon is the seller, 'Sold by Amazon.com' will appear in the Buy Box. When

to Zulily, since 2019, Amazon has increased its use of an algorithm called "Select Competitor – Featured Offer Disqualification," which "automatically disqualifies a seller from winning the Buy Box if Amazon detects a price that is lower for that product on any online store that Amazon designates as a 'Select Competitor.'" *Id.* at 34 ¶ 117. Zulily says that other punishments for violating the price-parity agreements include "moving the offending products so far down in search results that shoppers are unlikely to find them, excluding retailers from sponsored-products advertisements, excluding sellers from 'recommended' lists, and/or erasing a product's price from view entirely, even if is [*sic*] the best available on Amazon." *Id.* at 34 ¶ 118. Amazon also punishes sellers by suspending particular products or their entire line of products. *Id.* at 34 ¶ 119. According to Zulily, Amazon has even "banish[ed] sellers from Amazon permanently." *Id.*

Zulily also alleges that Amazon uses a "first-party anti-discounting" algorithm to "deter other online stores from offering lower prices than those of Amazon's Retail products." *Id.* at 35 ¶¶ 121–22. If the algorithm detects

> the lowest price for a product sold by a monitored online store or marketplace seller increases (or the product goes out of stock), Amazon automatically increases its price to duplicate the new lowest price, whether that is a higher price offered by the same online competitor or marketplace seller it had been copying or a price offered on a different website. If Amazon detects a "lowest price" drop, Amazon automatically copies that move. And if the "lowest price" increases, Amazon automatically copies again without even considering whether it could earn more business by continuing to offer shoppers the lower price.

*Id.* at 35 ¶ 122.

The Complaint states that, since 2019, Amazon has "recognized that Zulily was an emerging entrant in the online superstore market and was pursuing scale by offering shoppers

the seller is a third-party retailer, that seller's name will appear in the 'Sold by' information in the Buy Box." *Id.*

'the lowest price online' for various products during limited-time 'flash sales.'" *Id.* at 36 ¶ 124. Zulily alleges that "Amazon could not tolerate the price competition, so 'it set out to destroy' Zulily, even though Amazon's U.S. sales volume was 100 times greater than Zulily's." *Id.* at 36 ¶ 126. Zulily says that Amazon "actively punished sellers whose products were being sold on Zulily at prices below Amazon's" and "after just one year of being targeted by Amazon, Zulily lost nearly half of its suppliers that also had products listed for sale on Amazon, and those suppliers are still dwindling today." *Id.* at 36 ¶ 127. The suppliers told Zulily that they lost access to Amazon's "Buy Box" because "Zulily's prices were too low," and the suppliers "could not afford to lose their Amazon sales." *Id.* at 36 ¶ 128. One of Zulily's apparel suppliers emailed Zulily and said that they had "almost 2000 skus suppressed on Amazon" because of lower prices on Zulily. *Id.* at 38–39 ¶ 134. Amazon also indirectly told the supplier that Zulily is "the issue with all of their inactive skus." *Id.* The seller informed Zulily that they needed to increase their prices on Zulily's site or they would have to stop selling their "best selling styles" to Zulily. *Id.*

Zulily says that "Amazon's price-fixing agreements and exclusionary conduct requires Zulily merchants ***not*** to discount or otherwise offer low prices on Zulily, causing Zulily to lose profits, a substantial volume of consumer sales, and web traffic." *Id.* at 40 ¶ 141 (emphasis in original). Zulily contends that it has lost suppliers "who had no choice but to pull products and/or stop dealing with Zulily entirely in response to Amazon's punishments and threats even though it is not Zulily's standard business model to charge merchants fees and merchants generally prefer working with Zulily over Amazon." *Id.* at 40 ¶ 143.

Zulily filed the Complaint on December 11, 2023. Dkt. # 1. It brings eight causes of action: (1) a hub and spoke conspiracy to restrain trade claim under Section One of the Sherman Act (15 U.S.C. § 1); (2) a third-party retailer conspiracy to restrain trade claim under Section

One of the Sherman Act (15 U.S.C. § 1); (3) a wholesale supplier conspiracy to restrain trade claim under Section One of the Sherman Act (15 U.S.C. § 1); (4) a monopolization of the online superstore market claim under Section Two of the Sherman Act (15 U.S.C. § 2); (5) an attempted monopolization of the online superstore market claim under Section Two of the Sherman Act (15 U.S.C. § 2); (6) – (7) claims for alleged violations of Washington state antitrust law under the state's Consumer Protection Act (CPA), Revised Code of Washington (RCW) §§ 19.86.030, 19.86.040; and (8) a claim for a separate violation of the CPA (RCW § 19.86.020). *See generally* Dkt. # 1.

## III
## Discussion

Amazon moves to dismiss Zulily's claims on various grounds, saying: (1) Zulily lacks antitrust standing because it has not suffered an "antitrust injury" in the relevant market; (2) it fails to state a hub and spoke conspiracy to restrain trade claim under Section One of the Sherman Act; (3) it fails to plausibly allege anticompetitive effects under Section One or Two of the Sherman Act; (4) it fails to allege anticompetitive conduct under Section Two of the Sherman Act; (5) the state law antitrust claims fail for the same reasons as the federal claims; and (6) Zulily fails to plausibly allege deceptive acts or practices in violation of the CPA. *See generally* Dkt. # 25.

### A. Antitrust Standing

Amazon says that the antitrust claims must be dismissed because Zulily lacks antitrust standing; it says that Zulily has not suffered an "antitrust injury" because it "is not a participant in the primary relevant market alleged in the Complaint." Dkt. # 25 at 12.

Section Four of the Clayton Act permits suit for recovery of damages by "any person […] injured in [their] business or property by reason of anything forbidden in the antitrust laws[.]" 15 U.S.C. § 15(a). This provision could be read quite broadly as affording "relief to all persons whose injuries are causally related to an antitrust violation." *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996) (quoting *Lucas v. Bechtel Corp.*, 800 F.2d 839, 843 (9th Cir. 1986)). But the United States Supreme Court determined that Congress did not intend for Section Four to wield such breadth. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) (*AGC*). As a result, it developed "antitrust standing," a requirement distinct from Article III standing. *See id; see also In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1059, 1065 (N.D. Cal. 2007) ("Only those who meet the requirements for 'antitrust standing' may pursue a claim . . . and to acquire 'antitrust standing,' a plaintiff must adequately allege and eventually prove 'antitrust injury.'") (citations omitted).

In *AGC*, the Supreme Court identified five factors to analyze when determining whether a plaintiff has antitrust standing. *See Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999). These factors include "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type [of injury] the antitrust laws were intended to forestall [i.e., anti-trust injury]; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Id.* (citations omitted); *see also City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 (9th Cir. 2021) (same). While no single factor dispenses with antitrust standing, the Supreme Court has said that "'[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4.'" *Am. Ad. Mgmt., Inc.*, 190 F.3d at 1055 (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986)); *see also Oakland Raiders*, 20 F.4th at 456 ("[T]he first factor—antitrust injury—is mandatory.").

To properly plead antitrust injury, a plaintiff must allege: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  *Am. Ad. Mgmt., Inc.*, 190 F.3d at 1055; *Oakland Raiders*, 20 F.4th at 455 (same).  Amazon does not raise any issues about the first three requirements.  Dkt. # 25 at 12–15.  As to the fourth, Amazon correctly notes that the Ninth Circuit has said that antitrust injury "'requires the plaintiff to have suffered its injury in the market where competition is being restrained.'"  *Id.* at 13 (quoting *Am. Ad. Mgmt., Inc.*, 190 F.3d at 1057).  Amazon also correctly observes that a party whose injury is experienced in a different market does not suffer an antitrust injury.  *Id.* (citing *Am. Ad. Mgmt., Inc.*, 190 F.3d at 1057; *F.T.C. v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020)).  It asserts that Zulily does not "plausibly allege" that it competed in the Online Superstore Market, and so any "injuries that it claims to have sustained from antitrust violations alleged to have occurred in [the Online Superstore Market]" does not qualify as an "antitrust injury for Zulily."  *Id.* at 13, 15 (internal quotation and citations omitted).

Zulily counters that it "explicitly alleges" in the Complaint "that it competed in the relevant market."  Dkt. # 37 at 13.  In the Complaint, Zulily says that Amazon has monopoly power in the Online Superstore Market.  Dkt. # 1 at 10 ¶ 30.  It describes online superstores as competing "for online consumer sales across multiple categories of new retail goods—through a unique set of features that increase efficiencies for shoppers, including custom delivery."  *Id.* According to Zulily, online superstores also compete for sellers, including third-party retailers and wholesalers "that want to reach consumers."  *Id.* at 10 ¶ 31.  Zulily alleges that it competes in the Online Superstore Market "as an online retailer offering a 'breadth and depth' of product selection that cannot be replicated in a physical store and that limited-selection online stores lack. The products available on Zulily span multiple categories, including clothes, beauty, toys,

home decor, and electronics." *Id.* at 19 ¶ 59.  It also says that the Federal Trade Commission (FTC) and Amazon recognized Zulily as an "emerging competitor" in this market.  *Id.* at 19 ¶¶ 60–61.

Zulily has plausibly alleged that it competes with Amazon in the Online Superstore Market.  *See, e.g.*, *Am. Ad. Mgmt., Inc.*, 190 F.3d at 1057 (reasoning that "consumers and competitors are most likely to suffer antitrust injury").  Thus, Zulily has standing to pursue its antitrust claims.[2]

B.    Rule 12(b)(6) Standards

Under Federal Rule of Civil Procedure 12(b)(6), Amazon moves to dismiss Zulily's Sherman Act Section One and Section Two claims as well as its Washington state-law claims.[3] Dkt. # 25 at 18–29.

When considering a motion to dismiss under Rule 12(b)(6), a court construes the complaint in the light most favorable to the nonmoving party.  *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013).  The court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff.  *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

---

[2] In its Motion, Amazon also contends that Zulily lacks antitrust standing as a "prospective entrant" in the Online Superstore Market and that Zulily "otherwise fails to allege facts necessary to establish the existence of alternative prospective markets."  Dkt. # 25 at 12, 15–18.  The Court need not reach these issues because Zulily has plausibly alleged antitrust standing as a competitor in the Online Superstore Market.

[3] The Parties agree that Zulily's federal and state law antitrust claims "rise and fall together," and the Parties do not separately brief these claims.  *See* Dkts. ## 25 at 26–27, 37 at 32–3, 42 at 16.  The Court, recognizing that the standards are "essentially the same," analyzes Zulily's federal and state claims under the federal standard.  *REX - Real Est. Exch. Inc. v. Zillow Inc.*, No. C21-312 TSZ, 2021 WL 3930694, at *4 (W.D. Wash. Sept. 2, 2021); *see also PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178 (W.D. Wash. 2021); *State v. Black*, 100 Wash. 2d 793, 799–800, 676 P.2d 963, 967–68 (1984); *State v. LG Elecs., Inc.*, 186 Wash. 2d 169, 187, 375 P.3d 1035, 1045 n.3 (2016).

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (citing *Twombly*, 550 U.S. at 556). "Dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

C. Sherman Act Section One & RCW Section 19.86.030

Section One of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Washington law likewise prohibits "[e]very contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce." RCW § 19.86.030

Amazon contends that Zulily's federal and state claims fail because (1) Zulily's hub-and-spoke conspiracy claim fails to allege a "rim" and (2) Zulily's third-party retailer and wholesale supplier conspiracy-to-restrain-trade claims fail to allege substantial anticompetitive effects. Dkt. # 25 at 18–23.[4]

1. Hub-and-Spoke Conspiracy to Restrain Trade

Amazon contends that Zulily's hub-and-spoke conspiracy claim fails because the Complaint fails to allege "substantial facts to support the existence of such a conspiracy's key element—a 'rim.'" Dkt. # 25 at 18. The Court agrees.

A hub-and-spoke conspiracy consists of three elements: "(1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical

[4] Zulily says in its Complaint that its first, second, and third claims (i.e., its Section One Sherman Act claims) "each constitutes an independent violation of Wash. Revised Code § 19.86.030." Dkt. # 1 at 53 ¶ 217.

agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015) (internal citation omitted). According to Zulily, Amazon (the hub) "organized a series of agreements" with third-party retailers and wholesale suppliers (the spokes). Dkt. # 1 at 42 ¶¶ 151–53. Zulily says that Amazon's third-party retailers and wholesalers "tacitly agreed with each other to eliminate horizontal retail price competition" (the rim). *Id.* at 43 ¶¶ 156–57.

The Ninth Circuit has said that "[a] hub-and-spoke conspiracy is simply a collection of vertical and horizontal agreements." *Musical Instruments*, 798 F.3d at 1192. Vertical agreements are "between 'persons at different levels of the market structure, e.g., manufacturers and distributors.'" *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 500 (M.D. Tenn. 2023) (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)). Horizontal agreements are "'between competitors at the same level of the market structure.'" *Id.* (quoting *Topco Assocs., Inc.*, 405 U.S. at 608). The Ninth Circuit has also stated that once a hub-and-spoke conspiracy "is broken into its constituent parts, the respective vertical and horizontal agreements can be analyzed either under the rule of reason or as violations per se." *Musical Instruments*, 798 F.3d at 1192. It has observed that "a rimless hub-and-spoke conspiracy *is not a hub-and-spoke conspiracy at all* (for what is a wheel without a rim?); it is a collection of purely vertical agreements."[5] *Id.* at 1193 n.3 (emphasis added).

---

[5] The Ninth Circuit has also noted that a "rimless hub-and-spoke conspiracy [i.e., purely vertical restraints] . . . may yet unreasonably restrain trade" in violation of Section One. *Musical Instruments*, 798 F.3d at 1193 n.3. But this would not be classified as a hub-and-spoke conspiracy. *Id.*; *see also Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 898–99 (2007). It noted "one key difference between a rimless hub-and-spoke conspiracy (*i.e.*, a collection of purely vertical agreements) and a rimmed hub-and-spoke conspiracy (*i.e.*, a collection of vertical agreements joined by horizontal agreements): courts analyze vertical agreements under the rule of reason. . .whereas horizontal agreements are violations per se," which is "more appealing to plaintiffs" because of the "potential difficulty and costliness of proving a § 1 claim under the rule of reason." *Musical Instruments*, 798 F.3d at 1193 n.3 (citing *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223–24 (1940)).

a. Hub-and-spoke group boycott

First, Zulily responds that it has alleged a "per se illegal *Klor's*-style 'hub-and-spoke' conspiracy." Dkt. # 37 at 20. It says that in such a conspiracy, "a capital-A agreement at the rim is unnecessary." *Id.* at 22. Zulily states that "Amazon's price-parity and minimum-margin agreements fixed the minimum prices that could be charged by ***other retailers***—not by Amazon." *Id.* at 23 (emphasis in original). It says that these retailers are Amazon's "horizontal competition" and "a horizontal fix that is no less pernicious because the mastermind was 'facially vertical' to the spokes." *Id.* Amazon replies that the Complaint does not plausibly allege a *Klor's* style hub-and-spoke conspiracy because Zulily "makes no effort to show that any such [horizontal] agreement exists among the hundreds of thousands of third-party sellers in Amazon's marketplace." Dkt. # 42 at 11.

In *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959), the Supreme Court determined that a per se Sherman Act Section One violation had occurred in a situation involving a dominant retailer who "used its 'monopolistic' buying power" to exert pressure on household appliance manufacturers and distributors to stop doing business with one of the retailer's rivals. *Id.* at 209. The manufacturers and distributors then agreed among themselves to boycott the retailer's rival or to sell to the rival "only at discriminatory prices and highly unfavorable terms." *Id.* Later courts have referred to this scenario, "where one dominant firm pressures other firms at a different level of the supply chain," as a "hub-and-spoke group boycott." *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 821 (9th Cir. 2023). In a hub-and-spoke group boycott, the dominant firm acts as the hub, and the firms under pressure from the dominant firm are the spokes. *Id.* But the Ninth Circuit has noted that "'[a]ntitrust law does not permit the application' of this *Klor's*-style per se rule 'in the absence of a *horizontal agreement*'"—i.e., an agreement

among the pressured firms to boycott the dominant firm's rival." *Id.* (quoting *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 138 (1998)) (emphasis in original).

Here, the Complaint says that Amazon's third-party retailers "agreed to Amazon's price-parity provisions and/or policies. . . with the objective to eliminate horizontal retail price competition." Dkt. # 1 at 43 ¶ 154. It also states that Amazon's wholesale suppliers "agreed to price-parity or minimum margin agreements. . . with the objective to eliminate horizontal retail price competition." *Id.* at 43 ¶ 155. Zulily further alleges that Amazon's third-party retailers "tacitly agreed" among themselves to "eliminate horizontal retail price competition." *Id.* at 43 ¶ 156. Zulily asserts that Amazon's wholesale suppliers also "tacitly agreed" with each other to do the same. *Id.* at 43 ¶157. Zulily contends that "[e]ach third-party retailer (and wholesaler) knew that every other third-party retailer (and wholesaler) was reaching the same, or similar, price parity agreement with Amazon with the object and effect of restraining online retail price competition." *Id.* at 44 ¶ 158. It says that Amazon's third-party retailers and wholesalers "communicated with one another, at least through ecommerce consultants, to ensure that other third-party retailers and wholesalers had agreed and were complying with the agreement to eliminate online retail price competition." *Id.* at 44 ¶ 161.

The Complaint plausibly alleges that vertical agreements existed between Amazon and its third-party retailers and wholesale suppliers (i.e., the price parity and minimum-margin agreements). But the Complaint does not plausibly allege that Amazon pressured its retailers and wholesale suppliers, who in turn entered into a horizontal conspiracy among themselves, to boycott Amazon's competitors. Even though Zulily alleges that the retailers and wholesalers "tacitly agreed" with each other to "eliminate horizontal retail price competition" and "communicated with one another" through ecommerce consultants about compliance with the price-parity agreements, Zulily "must plead 'something more,' 'some further factual

enhancement,' a 'further circumstance pointing toward a meeting of the minds' of the alleged conspirators." *See Musical Instruments*, 798 F.3d at 1193 (quoting *Twombly*, 550 U.S. at 557, 560). A plaintiff must allege "sufficient facts to provide a plausible basis from which [a court] can infer the alleged agreements' existence." *Id.* Zulily does not plead "some further factual enhancement" to plausibly show a conspiracy among third-party retailers and wholesale suppliers to act against Amazon's competitors.

The cases that Zulily cites to supports its *Klor's*-style hub-and-spoke conspiracy are distinguishable. In these cases, the courts relied on facts that showed that the spokes had an agreement among themselves to take concerted action against the hub's competitors. In *United States v. Apple*, 791 F.3d 290 (2d Cir. 2015), the Second Circuit reviewed the district court's findings of fact and conclusions of law following a bench trial in which the district court concluded that Apple had violated Section One of the Sherman Act by orchestrating a conspiracy with book publishers to "'eliminate retail price competition [in the e-book market] in order to raise the retail prices of e-books.'" *Id.* at 311–13 (quoting *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 647 (S.D.N.Y.2013)) (alteration in original). The Second Circuit reasoned that the book publishers' "joint action against Amazon" (i.e., Apple's competition in the e-book market) did *not* stem from "parallel decision making" and noted that the book publishers "were in constant communication regarding their negotiations with both Apple and Amazon" and that the contract each book publisher had with Apple "would be attractive only if the publishers acted collectively." *Id.* at 316, 318. The court determined that Apple "never seriously argue[d]" that the book publishers "were not acting in concert." *Id.*

In *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000), the court reviewed the FTC's determination that Toys "R" Us violated Section Five of the FTC Act, 15 U.S.C. § 45 by "act[ing] as the coordinator of a horizontal agreement among a number of toy manufacturers."

*Id.* at 930. The court agreed with the FTC that this was a "compelling case for inferring [a] horizontal agreement [amongst the toy manufacturers] . . . because not only was the manufacturers' decision to stop dealing with the warehouse clubs an abrupt shift from the past, and not only [was] it suspicious for a manufacturer to deprive itself of a profitable sales outlet, but the record . . . included . . .direct evidence of communications" that showed that the toy manufacturers would only agree to Toys "R" Us' demands if their competitors were "doing the same thing." *Id.* at 935–36.

Based on the above, the Court concludes that Zulily has failed to plausibly allege a hub-and-spoke group boycott (i.e., a *Klor's*-style hub-and-spoke conspiracy).

        b.      Horizontal agreement at the "rim" based on "plus factors"

In the alternative, Zulily says that it has "plausibly alleged" a "capital-A agreement . . . at the rim" to support its hub-and-spoke conspiracy claim. Dkt. # 37 at 24. Zulily says that, to allege an agreement among the spokes, "the Ninth Circuit requires parallel conduct and certain plus factors, i.e., 'economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action.'" *Id.* (quoting *Musical Instruments*, 798 F.3d at 1194). Amazon replies that the purported "plus factors" identified in the Complaint do not "nudge" Zulily's allegations of horizontal agreements among third-party retailers and "across the line from conceivable to plausible." *See Musical Instruments*, 798 F.3d at 1193 (quoting *Twombly*, 550 U.S. at 570); *see also* Dkt. # 42 at 12–13. The Court addresses each purported "plus factor" in turn. *See, e.g.*, *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir.1999) ("Parallel pricing is a relevant factor to be considered along with the evidence as a whole; if there are sufficient other 'plus' factors, an inference of conspiracy can be reasonable.").

*Action Against Self-Interest.* Zulily says this case includes "extreme action" against self-interest. Dkt. # 37 at 26–27. It contends that the Complaint alleges facts that show that third-

party retailers and wholesalers "wanted to diversify from Amazon, rather than become more dependent on it" but "third-party resellers and wholesalers had no choice but to stop dealing with retailers like Zulily who wished to compete with Amazon on price." *Id.* at 26 (citing Dkt. # 1 at 36–39 ¶¶ 128–35). Amazon replies that "[t]his factor only supports an inference of conspiracy when there is conduct that would be "contrary to the [alleged conspirators'] *individual self-interest* but consistent with their collective interest." Dkt. # 42 at 12 (quoting *Apple*, 791 F.3d at 318) (second alteration in original) (emphasis in original).

In the Complaint, Zulily says that "[t]he third-party retailers acted against their individual interests in agreeing with Amazon to price parity and in complying with the agreement" and that the "same is true for wholesalers." Dkt. # 1 at 44 ¶¶ 159–60. Zulily also alleges that "[c]ompliance with the price-parity agreements is not in the respective individual interests of sellers" and "[o]ne third-party retailer reported that it might charge higher prices on Amazon than prices on other sells channels in order to offset the high Amazon fees that cause it to have lower sales margins on sales through Amazon than through any other channel." *Id.* at 26–27 ¶ 96. Zulily contends that at least one e-commerce consultant "that has advised numerous Amazon third-party sellers recognized that the sellers must sell on Amazon to be successful in the ecommerce space." *Id.* at 25–26 ¶ 92.

Zulily's allegations are similar to the plaintiffs' allegations in *Musical Instruments*; there, the plaintiffs stated that the defendant musical instrument manufacturers acted against their self-interest by agreeing to minimum-advertised-price (MAP) policies with Guitar Center—a major musical instrument retailer. 798 F.3d at 1195. The Ninth Circuit noted that an example of an action against self-interest that would suggest collusion among the "spokes" would be if "individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement." *Id.* It said that an act would

be against the manufacturers' self-interest if "no reasonable manufacturer would have entered into a MAP policy without assurances that all other manufacturers would enter into similar agreements." *Id.* The court noted that the complaint provided "ample independent business reasons why each of the manufacturers adopted and enforced MAP policies even absent an agreement among the defendant manufacturers." *Id.*

Here, like the plaintiffs in *Musical Instruments*, Zulily does not plausibly allege that Amazon's third-party retailers or wholesalers would not have entered into price-parity or minimum-margin agreements with Amazon absent "assurances" that other retailers and wholesalers were also doing so. Nor does the Complaint say that "individual action" among the third-party retailers or wholesalers would be "so perilous" without some kind of advanced agreement among them. *See Musical Instruments*, 798 F.3d at 1195 (reasoning that the "[m]anufacturers' decisions to heed similar demands made by a common, important customer do not suggest conspiracy or collusion. They support a different conclusion: self-interested independent parallel conduct in an interdependent market").

*The FTC's & California Attorney General's Investigations of Amazon.* Zulily contends that the FTC's investigation shows that "Amazon created the price-fixing agreements and enforced them" and the California Attorney General's (AG) investigation also demonstrates that Amazon "orchestrated illegal price collusion." Dkt. # 37 at 26–27. Amazon replies that neither the FTC nor the State of California has alleged "a horizontal conspiracy like the one Zulily is attempting to show." Dkt. # 42 at 12. Amazon states that "the FTC did not sue Amazon at all for any agreements in restraint of trade under Section 1 of the Sherman Act, and California alleges only *vertical* agreements subject to the rule of reason." Dkt. # 42 at 12 (citing Dkt. # 37-1 at 9–12) (emphasis in original).

In *Musical Instruments*, the plaintiffs asserted that the FTC's investigation of the National Association of Music Merchants (NAMM) supported their argument that a horizontal agreement existed among the defendant manufacturers. 798 F.3d at 1196. But the court rejected this argument because the FTC alleged that NAMM violated Section Five of the FTC Act, 15 U.S.C. § 45, which "prohibits 'unfair methods of competition.'" *Id.* The court emphasized that the FTC did not contend that NAMM violated Section One of the Sherman Act. *Id.* The court noted that a Section Five FTC Act violation, unlike a Section One Sherman Act violation, "does not require allegation and proof of a contract, combination, or conspiracy." *Id.*

In September 2023, the FTC sued Amazon for alleged violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 2 of the Sherman Act, 15 U.S.C. § 2. *See F.T.C. v. Amazon*, No. 2:23-cv-01495-JHC, 2024 WL 4448815, at *1 (W.D. Wash. Sept. 30, 2024). In that case, the FTC does not contend that Amazon violated Section One and neither Section 5(a) nor Section Two requires allegations and proof of a contract, combination, or conspiracy. *See id.* California sued Amazon for alleged violations of the Cartwright Act, Cal. Bus. & Prof. Code § 16720 *et seq.*,[6] and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* *See* Dkt. # 37-1 at 8, 16. The State does not allege that a horizontal conspiracy existed among retailers or wholesalers who sell products on Amazon. *See generally* Dkt. # 37-1. Thus, neither the FTC's investigation nor the California AG's investigation into Amazon's conduct support Zulily's allegations that a horizontal agreement existed among Amazon's third-party retailers and wholesalers.

[6] The Cartwright Act is California's antitrust statute. *See, e.g.*, *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 132 Cal. Rptr. 3d 660, 671 (Cal. Ct. App. 2011) ("The Cartwright Act prohibits combinations in unreasonable restraint of trade.").

*Knowledge that Other Third-Party Retailers and Wholesalers are Bound by Identical Agreements.* Zulily asserts that "each third-party retailer (and wholesaler) knew that every other third-party retailer (and wholesaler) had made the same pricing agreements with Amazon because Amazon advertised the agreements and the fact that they were non-negotiable—a clear invitation to agree." Dkt. # 37 at 27. Amazon says that Zulily cites no allegations to support its argument and "[t]here is no factual basis for [this] conclusory allegation whatsoever." Dkt. # 42 at 12–13.

To support its contention that this plus factor bolsters its hub-and-spoke conspiracy claim, Zulily cites *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, No. 20-CV-5428 (JMF), 2022 WL 4448621, at *12 (S.D.N.Y. Sept. 23, 2022), a case in which the court determined that the plaintiff had plausibly alleged a hub-and-spoke conspiracy "that had as its objective a bid-rigging scheme." *Id.* at *12. The court reasoned that "where parties to vertical agreements have knowledge that other market participants are bound by identical agreements, and *their participation is contingent on that knowledge*, they may be considered participants in a horizontal agreement in restraint of trade." *Id.* (emphasis added). Here, unlike in *Nastasi*, Zulily does not allege that the third-party retailers and wholesalers participation in the price parity and MMAs with Amazon depended on them knowing that other retailers and wholesalers would be bound by identical agreements.

*Susceptibility of the Market to Conspiracy.* Zulily says that it "alleges a market susceptible to conspiracy, including a hub with monopolistic power as ringleader." Dkt. # 37 at 27. Amazon notes that Zulily cites no allegations to support its argument. Dkt. # 42 at 13. Amazon also contends that the issue "is whether the market is susceptible to a *horizontal* conspiracy in restraint of trade" and "the fact that the horizontal conspiracy would need to

include hundreds of thousands of third-party sellers and wholesalers makes a horizontal agreement anything but plausible." *Id.* (emphasis in original).

In its Complaint, Zulily does not say how the Online Superstore Market is "susceptible" to a horizontal conspiracy among the third-party retailers and wholesale suppliers. *See, e.g.*, Dkt. # 1 at 42 ¶ 151 (alleging that "Amazon orchestrated a hub-and-spoke conspiracy with the illegal object to restrain horizontal retail price competition among online superstores in all product categories"). Thus, the Court agrees with Amazon that Zulily has failed to plausibly allege a market susceptible to a horizontal conspiracy in restraint of trade. *See, e.g.*, *Musical Instruments*, 798 F.3d at 1193–94 ("*Twombly* requires that when allegations of parallel conduct are set out to make a § 1 claim, plaintiffs must plead enough nonconclusory facts to place that parallel conduct 'in a context that raises a suggestion of a preceding agreement.'") (quoting *Twombly*, 550 U.S. at 557).

Based on the above, Zulily's alleged "plus factors" do not plausibly suggest that Amazon's third-party retailers and wholesale suppliers entered into an illegal horizontal agreement. Thus, Zulily has not alleged a plausible hub-and-spoke conspiracy claim.

2. Unreasonable Restraints of Trade Under the Rule of Reason

The Supreme Court has interpreted Section One's prohibition against "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce" to "outlaw only unreasonable restraints" of trade or commerce. *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)) (emphasis in original). An "unreasonable restraint" is either per se illegal or treated as such under the "rule of reason." *Id.* at 540–41; *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 (9th Cir. 2023).

The rule of reason requires a plaintiff to show "that a particular contract or combination is in fact unreasonable and anticompetitive." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011) (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)). Thus, to state a claim under the rule of reason, a plaintiff must allege that (1) an agreement exists, (2) the agreement imposed an unreasonable restraint on trade (i.e., had an anticompetitive effect) under a rule of reason analysis, (3) the restraint was within the relevant market, and (4) it affected interstate commerce. *See Am. Ad. Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996); *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984).[7] Under the rule of reason, a court must "conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition." *Am Express Co.*, 585 U.S. at 541 (quoting *Copperweld Corp.*, 467 U.S. at 768). Amazon contends that Zulily's third-party retailer and wholesaler conspiracy claims fail because Zulily fails to allege substantial anticompetitive effects. Dkt. # 25 at 20.

Under Section One, a plaintiff may show that a restraint has anticompetitive effects in a relevant market through direct or indirect evidence. *F.T.C. v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020) (citing *Am. Express Co.*, 585 U.S. at 541). Direct evidence of anticompetitive

---

[7] Under the rule of reason, the Ninth Circuit uses a three-part burden shifting test in which a plaintiff has "the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *F.T.C. v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (quoting *Am. Express Co.*, 585 U.S. at 541). Once a plaintiff meets their burden, "the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* (quoting *Am. Express Co.*, 585 U.S. at 541). When ruling on Amazon's Rule 12(b)(6) motion to dismiss, the Court evaluates whether Zulily has met its "initial burden"—i.e., whether the Complaint plausibly alleges that the challenged restraint had a substantial anticompetitive effect. *See Zillow Inc.*, 2021 WL 3930694, at *5 n.5 ("In ruling on a 12(b)(6) motion, the Court exclusively focuses on whether Plaintiff has sufficiently pleaded the first element."); *see also Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 915 (W.D. Mo. 2019) (reasoning that, at the motion-to-dismiss stage, "the [c]ourt's job is not to balance the anticompetitive effects of [the challenged restraints] against the procompetitive justifications advanced by [the] [d]efendants").

effects includes "'proof of actual detrimental effects [on competition],' *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986), such as reduced output, increased prices, or decreased quality in the relevant market." *Am. Express Co.*, 585 U.S. at 542 (alteration in original); *see also Qualcomm Inc.*, 969 F.3d at 989; *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022). Indirect or circumstantial evidence of anticompetitive effects include "proof of market power plus some evidence that the challenged restraint harms competition." *Qualcomm Inc.*, 969 F.3d at 989 (citation omitted); *see also Am. Express Co.*, 585 U.S. at 542; *PLS.Com, LLC*, 32 F.4th at 834.

Amazon contends that the Complaint does not allege facts that "plausibly show that Amazon's alleged actions have substantial anticompetitive effects." Dkt. # 25 at 21. It says that although the Complaint states that Amazon's actions "'caus[ed] Zulily to lose profits, a substantial volume of consumer sales, and web traffic,'" "'harm to one or more competitors will not suffice' to state an antitrust claim." *Id.* at 21 (quoting Dkt. # 1 at 40 ¶ 141; *Qualcomm*, 969 F.3d at 990). Amazon also asserts that Zulily's allegations that Amazon's decision to remove third-party sellers from eligibility for the "Featured Offer" or "Buy Box" does not impact Zulily because, according to the Complaint, such actions purportedly cause third-party sellers "to raise the prices that they charge in *other marketplaces* in order to restore eligibility to be the Featured Offer on Amazon." *Id.* at 22 (internal citations omitted) (emphasis added). It says that Zulily "does not operate such a marketplace, and therefore no third-party seller could have taken such an action to raise prices in Zulily's store." *Id.* Amazon also contends that Zulily's allegations of vertical conspiracies with Amazon's wholesalers also fails to state any anticompetitive effects that impact Zulily. *Id.* It says that the Complaint fails to allege how the MMAs "may have

affected Zulily's own wholesale acquisition costs or otherwise impaired its ability to compete with Amazon for the retail sale of products purchased at wholesale." *Id.* at 22–23.[8]

Zulily responds that the Complaint states that the "overall net effect" of Amazon's conduct "was supracompetitive consumer prices and reduced output, choice and innovation." Dkt. # 37 at 29 (citing Dkt. # 1 at 41–42 ¶¶146–48). It contends that Amazon's argument contradicts Zulily's "well-pleaded facts" that Amazon's suppliers controlled Zulily's pricing because the Complaint alleges that the suppliers told "Zulily to raise its prices and/or abide by . . . MAP . . .policies, so that Zulily's retail prices would not be lower than Amazon's." *Id.* at 29–30 (citing Dkt. # 1 at 36 ¶ 127). Zulily says that it had to either choose not to compete with Amazon on price or lose suppliers— this competitive harm caused Zulily to lose of dozens of suppliers. *Id.* at 30 (citing Dkt. # 1 at 36 ¶ 127). Zulily also contends that the Complaint shows how Amazon's actions affected its wholesale costs. *Id.* The Complaint describes how the company "lost a slew of suppliers, website traffic, sales, and scale due to the combined effects of Amazon's scheme, making it impossible for Zulily to compete in the relevant market." *Id.*

The Complaint states that "Zulily and other competitors generally cannot win customers from Amazon with lower prices because Amazon has developed a system to fix retail prices across all online superstores and other online retailers so that the prices listed on Amazon are

---

[8] Amazon also challenges the alleged anticompetitive effects as to Zulily's Section Two Sherman Act claims "for the same reasons discussed . . .regarding Zulily's Section 1 claims." Dkt. # 25 at 23. The Ninth Circuit has determined that "[r]egardless of whether the alleged antitrust violation involves concerted anticompetitive conduct under § 1 or independent anticompetitive conduct under § 2, the three-part burden-shifting test under the rule of reason is essentially the same." *Qualcomm Inc.*, 969 F.3d at 991. This "means that courts often review claims under each section simultaneously" and "[i]f, in reviewing an alleged Sherman Act violation, a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2." *Id.* But while a plaintiff may use indirect evidence to show the anticompetitive effect of an alleged restraint under Section One, they *may not* rely on indirect evidence to show the anticompetitive effect of an alleged unlawful monopoly under Section Two. *Id.* The Court's analysis focuses on direct evidence of the anticompetitive effects of Amazon's conduct. Thus, the analysis applies to Zulily's Section One and Section Two claims.

always the lowest, though still supracompetitive." Dkt. # 1 at 21 ¶ 69.  It also alleges that Amazon's price-fixing agreements prevent "***any products*** that are being sold on Amazon from being sold off Amazon at prices that Amazon thinks are too low—even if, off Amazon, the seller is playing the role of a wholesaler and not setting retail prices."  *Id.* at 22 ¶ 72 (emphasis in original).  Zulily contends that "Amazon suppresses this price competition through collusion and by wielding its monopoly power to prevent sellers and retailers from offering lower prices off Amazon effectively resulting in an inflated Amazon price becoming the price floor everywhere else online."  *Id.* at 41 ¶ 147(c).  According to the Complaint, Amazon's conduct "suppresses quality, choice, and innovation" by limiting "the availability of products for customers to choose off-Amazon and prevents them from pursuing differentiated sales strategies tailored to the strengths and weaknesses of rival online superstores."  *Id.* at 42 ¶ 147(d).

The Complaint also states that, since 2019, "Amazon recognized that Zulily was an emerging entrant in the online superstore market and was pursuing scale by offering shoppers 'the lowest price online' for various products during limited-time 'flash sales.'"  *Id.* at 36 ¶ 124. It says that "Amazon could not tolerate the price competition, so 'it set out to destroy' Zulily." *Id.* at 36 ¶ 126.  Zulily alleges that "Amazon actively punished sellers whose products were being sold on Zulily at prices below Amazon's . . . [, and] after just one year of being targeted by Amazon, Zulily lost nearly half of its suppliers that also had products listed for sale on Amazon, and those suppliers are still dwindling today."  *Id.* at 36 ¶ 127.  Also, "Zulily's suppliers informed Zulily that they lost the Buy Box because Zulily's prices were too low, and that they could not afford to lose their Amazon sales."  *Id.* at 36 ¶ 128.  Zulily says that "Amazon's price-fixing agreements and exclusionary conduct requires Zulily merchants ***not*** to discount or otherwise offer low prices on Zulily, causing Zulily to lose profits, a substantial volume of consumer sales, and web traffic."  *Id.* at 40 ¶ 141 (emphasis in original).  These suppliers had "no

choice" but to either stop dealing with Zulily or pull their products from Zulily's site because of Amazon's threats and punishments even though Zulily did not charge merchant fees and "merchants generally prefer[red] working with Zulily over Amazon." *Id.* at 40 ¶ 143.

Viewed in the light most favorable to Zulily, the Complaint sufficiently alleges that Amazon's conduct increased the prices that consumers paid for products and otherwise reduced competition in the Online Superstore Market. *See, e.g.*, *Churchill Downs Inc. v. Thoroughbred Horsemen's Grp.*, *LLC*, 605 F. Supp. 2d 870, 887 (W.D. Ky. 2009) (reasoning that on a Rule 12(b)(6) motion, a "full analysis under the rule of reason would not be appropriate . . . given the fact intensive nature of that analysis"); *see also In re RealPage, Inc.*, 705 F. Supp. 3d at 521 (same). Thus, Zulily alleges plausible anticompetitive effects sufficient to survive the motion to dismiss. [9]

D. Sherman Act Section Two & RCW Section 19.86.040

Section Two of the Sherman Act prohibits the monopolization, or attempted monopolization, or combination or conspiracy to monopolize, of any part of trade or commerce among the states. 15 U.S.C. § 2. Washington law likewise prohibits "any person to monopolize,

[9] On a Rule 12(b)(6) motion "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563; *see also Snell v. G4S Secure Sols. (USA) Inc.*, 424 F. Supp. 3d 892, 904 (E.D. Cal. 2019) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." (internal citation and quotation omitted)); *Fairhaven Health, LLC v. BioOrigyn, LLC*, No. 2:19-CV-01860-RAJ, 2021 WL 5987023, at *4 (W.D. Wash. Dec. 17, 2021) (same). Because Zulily has adequately alleged a violation of Section One of the Sherman Act under the rule of reason, the Court need not determine whether Zulily has also alleged a per se violation of Section One. *See Duffy v. Yardi Sys., Inc.*, No. 2:23-CV-01391-RSL, 2024 WL 4980771, at *7 (W.D. Wash. Dec. 4, 2024) ("Because plaintiffs have alleged a per se violation of § 1 of the Sherman Act, the Court need not determine whether plaintiffs have also alleged unreasonableness under the rule of reason."); *see also Football Nw., LLC*, 511 F. Supp. 3d at 1178 ("A Section 1 plaintiff must sufficiently plead a restraint of trade that falls under one of three rules of analysis: rule of reason, per se, or quick look. While courts typically need not decide which standard to apply at the pleading stage, they must still determine whether the complaint has alleged sufficient facts to state a claim under at least one of these three rules.").

or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of trade or commerce."[10] RCW § 19.86.040.

A Section Two claim requires an antitrust plaintiff to show "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp*, 384 U.S. 563, 570–71 (1966). Monopoly power is not unlawful "unless it is accompanied by an element of anticompetitive conduct." *Qualcomm Inc.*, 969 F.3d at 990 (citing *Verizon Commc'ns Inc. v. L. Offs. Of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)). "Anticompetitive conduct is conduct without a legitimate business purpose that makes sense only because it eliminates competition." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014), *as corrected* (June 19, 2014) (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir.2007)) (internal citation omitted). Thus, a plaintiff must show "anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market." *Qualcomm Inc.*, 969 F.3d at 990. A monopolist's act is viewed as exclusionary if it has an "anticompetitive effect," meaning, that it harms "the competitive *process* and thereby harm[s] consumers." *Id.* (citations omitted) (emphasis in original). Amazon says that Zulily's Section Two claims fail because the Complaint does not plausibly allege anticompetitive conduct that had anticompetitive effects.[11]

---

[10] The Court analyzes Zulily's federal and state attempted monopolization and monopolization claims under the federal standard. *See supra* Sec. III.B. n.3.

[11] As discussed above, Amazon challenges the alleged anticompetitive effects of its conduct under Section One "for the same reasons" as it challenges the alleged anticompetitive effects under Section Two. Dkt. # 25 at 23. The Court's analysis of the anticompetitive effects of Amazon's actions applies to Zulily's Section One and Two claims. *See supra* Sec. III. C.2. n.8.

Amazon asserts that its practice of "matching rivals' discounts" is a "classic form of price competition." Dkt. # 25 at 24. It says that, under *Brooke Group Limited v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Id.* (quoting *Brooke Grp.*, 509 U.S. at 223). It contends that Zulily's allegations that Amazon's low prices caused Zulily to lose profits and prevented "Zulily from gaining scale through discounted pricing" run afoul of *Brooke Group*; there, the Supreme Court stated that "[t]o hold that the antitrust laws protect competitors from the loss of profits due to . . . price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share." *Id.* at 25 (quoting *Brooke Grp.*, 509 U.S. at 223). Amazon asserts that "Zulily's theory regarding price-matching would expose retailers to legal risk whenever they lowered their prices to meet competition, and prices would predictably rise as a result." *Id.*

Zulily counters that it has alleged a "plausible *prima facie* case" that Amazon's price-parity agreements "forced stores like Zulily either to raise their prices or risk losing suppliers." Dkt. # 37 at 32 (citing Dkt. # 1 at 27–28 ¶¶ 99–100, 103). It says that the conduct "eliminated the need for Amazon to lower its own prices (which would cut into its margin), maintaining market-wide prices on and off Amazon at artificially high levels and preventing competitors from gaining scale or excluding them from the market altogether." *Id.* at 31–32 (citing Dkt. # 1 at 40–41 ¶¶ 140–45). Zulily also contends that the "the earliest possible time to decide whether Amazon's proffered justification (allegedly lower consumer prices) is tenable and, if so, whether the purported justification is outweighed by the significant anticompetitive effects of the conduct overall is summary judgment." *Id.* at 31.

To the extent that Amazon's argument in support of its practices is based on pro-competitive justifications (i.e., lower prices for consumers), *see* Dkt. # 25 at 7, 25, the question

of "whether the alleged procompetitive benefits of the [challenged conduct] outweigh its alleged anticompetitive effects [(i.e., procompetitive justifications)] is a factual question that the district court cannot resolve on the pleadings." *PLS.Com*, 32 F.4th at 839; *see also United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1067 & n.16 (N.D. Cal. 2014). Procompetitive justifications can "be used to rebut [a plaintiff's] claims once a prima facie case has been established, but the Court need not consider such rebuttals on a motion to dismiss." *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 992 (W.D. Wash. 2022); *see also Floyd v. Amazon.com, Inc.*, No. C22-1599-JCC, 2023 WL 3891973, at *5 (W.D. Wash. June 8, 2023); *Brown v. Amazon.com, Inc.*, No. 2:22-cv-00965-JHC, 2023 WL 5793303, at *4 (W.D. Wash. Sept. 7, 2023); *De Coster v. Amazon.com, Inc.*, No. 2:21-cv-00693-JHC, No. 2:20-cv-00424-JHC, 2024 WL 4949037, at *10 (W.D. Wash. Dec. 3, 2024).

In *Brooke Group*, the plaintiff, a cigarette manufacturer, alleged that the defendant, one of its competitors, "cut prices on generic cigarettes below cost and offered discriminatory volume rebates to wholesalers to force [the plaintiff] to raise its own generic cigarette prices." 509 U.S. at 212. The plaintiff alleged price discrimination under the Robinson-Patman Act and argued that the defendant was part of an oligopoly that increased list prices for cigarettes "in lockstep." *Id.* at 213. The Supreme Court held that the evidence could not support a finding that the defendant's "alleged scheme was likely to result in oligopolistic price coordination and sustained supracompetitive pricing in the generic segment of the national cigarette market. Without this, [the defendant] had no reasonable prospect of recouping its predatory losses and could not inflict the injury to competition the antitrust laws prohibit." *Id.* at 243.

*Brooke Group* does not apply here because Zulily's claim is not a predatory pricing claim. Rather, Zulily contends that Amazon manipulates prices through "anti-discounting

algorithms" and by imposing "oppressive contractual conditions on merchants that make it difficult—if not impossible—for them to do business with online retailers besides Amazon." *See* Dkt. # 1 at 49–50 ¶¶ 194–96; *see also F.T.C. v. Amazon.com, Inc.*, 2024 WL 4448815, at *6 (reasoning that, because the plaintiffs did not assert a predatory pricing claim, *Brooke Group* did not bar their Sherman Act Section Two claim); *see also Church & Dwight Co. v. Mayer Lab'ys, Inc.*, No. C-10-4429 EMC, 2011 WL 1225912, at *10 (N.D. Cal. Apr. 1, 2011) (determining that *Brooke Group* did not apply because the plaintiff did not bring a "predatory pricing claim").

Zulily plausibly alleges that Amazon's anti-discounting practices are anticompetitive. It contends that "Amazon aggressively monitors market prices to punish any third- party retailers and/or wholesale suppliers who Amazon perceives to violate its price-parity or minimum-margin agreements by discounting below Amazon's prices." Dkt. # 1 at 29 ¶ 108. The Complaint also says that "Amazon's price-fixing agreements with its retailers broadly prohibit ***any products*** that are being sold on Amazon from being sold off Amazon at prices that Amazon thinks are too low—even if, off Amazon, the seller is playing the role of a wholesaler and not setting retail prices." *Id.* at 22 ¶ 72 (emphasis in original). Zulily contends that Amazon coerced "third-party retailers and wholesale suppliers to agree to 'price parity,' i.e., to artificially raise Zulily prices at or above Amazon's, and to punish any sellers who cheated." If a retailer or supplier failed to comply, "[p]unishments ranged from disqualifying a seller from the 'Buy Box'—the mechanism most consumers use to buy an item or add it to their cart—to 'total banishment from Amazon's Marketplace." *Id.* at 2 (internal citation omitted). Suppliers told Zulily that they lost access to Amazon's "Buy Box" because "Zulily's prices were too low," and the suppliers "could not afford to lose their Amazon sales." *Id.* at 36 ¶ 128. The Complaint describes one of Zulily's beauty-products suppliers as asking Zulily whether

> there is a way [Zulily] can increase the sale prices? I am receiving complaints from several of my online retail partners (especially the exclusive partner for the Amazon marketplace) . . . When Amazon detects a substantially lower price for the same item, Amazon will automatically reduce traffic and un-feature the item on Amazon. Thus, the sales on Amazon dropped significantly and my Amazon partner was not happy about this.

*Id.* at 37 ¶ 130. According to the Complaint, when Zulily pushed back against this request, the supplier left Zulily all together. *Id.*

The Complaint also says that Amazon "used its anti-discounting algorithm against Zulily to foreclose future price competition." Dkt. # 1 at 39 ¶ 136. Zulily alleges that the algorithm "quickly copied Zulily's prices" and lowered Amazon's prices in response. *Id.* Zulily then "reduced its prices further, and Amazon's algorithm undercut them again. This resulted in 'continuous price spirals,' causing Zulily to drop products from its online store." *Id.* The Complaint alleges that Amazon "acknowledged that its tactics against Zulily had worked" and it "observed a 'consistent drop' in Zulily traffic." *Id.* at 39 ¶ 138. But according to Zulily, "Amazon's Vice President of Pricing told his team to 'keep going' in an effort to eliminate price competition from Zulily entirely." *Id.* at 39 ¶ 138. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 231 (S.D.N.Y. 2019) (reasoning that "the Supreme Court has made clear that 'intent is . . . relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'") (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985)).

Taking Zulily's well-pleaded facts as true, and drawing all reasonable inferences in its favor, the Court concludes that the Complaint adequately alleges that the challenged discounting practices are anticompetitive for purposes of Zulily's Section Two Sherman Act claim.[12] *See*

[12] In its Reply, Amazon contends for the first time that Zulily fails "to allege market power within the market alleged to be monopolized." Dkt. # 42 at 16. The Court declines to address this issue. *See, e.g.*, *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider

*Dreamstime.com, LLC v. Google LLC*, 54 F.4th at 1130, 1137 (9th Cir. 2022) ("Anticompetitive conduct consists of acts that tend[ ] to impair the opportunities of rivals and do[ ] not further competition on the merits or do[ ] so in an unnecessarily restrictive way.") (internal quotation marks and citation omitted) (alterations in original)).

E.    The Washington Consumer Protection Act

The parties agree that the majority of Zulily's CPA, RCW §§ 19.86.010 to 19.86.920, claims "rise and fall" with its federal claims. *See* Dkts. ## 25 at 26–27; 37 at 32–33. But Amazon separately challenges Zulily's deceptive-acts-or-practices claim under the CPA, RCW § 19.86.020. Amazon says that Zulily's allegation that "Amazon . . .engaged in acts and practices that have the capacity to—and did—deceive a substantial portion of the public, i.e., by falsely representing to consumers that its prices are the lowest and/or competitive leading consumers to believe that they paid fair—and not artificially inflated—prices" is conclusory. Dkts. ## 1 at 56 ¶ 237; 25 at 28. Amazon contends that "[n]ot once in its Complaint does Zulily describe an instance of Amazon's 'falsely representing to consumers that its prices are the lowest.'" Dkt. # 25 at 28 (quoting Dkt. # 1 at 56 ¶ 237). Amazon argues that Zulily does not allege any false representations or say that any consumer was "misled or deceived" by Amazon's pricing disclosures. Dkt. # 42 at 16.

Zulily responds that the Complaint alleges that Amazon imposed price-parity and MMAs that artificially raises prices off-Amazon. Dkt. # 37 at 33 (citing Dkt. # 1 at 44 ¶¶ 159–60). Zulily says that Amazon's conduct "maintains prices at artificially high levels—and precludes competitive prices from being advertised and/or charged. When consumers see an Amazon price

arguments raised for the first time in a reply brief.") (citing *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003)).

and are led to believe it is competitive or truly the 'low,' that impression is false." Dkt. # 37 at 33 (citing Dkt. # 1 at 56 ¶ 235(f)).

The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW § 19.86.020. Under the CPA, "a plaintiff must establish five distinct elements: (1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 780, 719 P.2d 531, 533 (1986); *see also Greenberg v. Amazon.com, Inc.*, 3 Wash. 3d 434, 453, 553 P.3d 626, 638 (2024), *as amended* (Aug. 16, 2024).

For a Washington CPA claim, a deceptive act is "'a representation, omission or practice that is likely to mislead' a reasonable consumer.'" *Shields v. Fred Meyer Stores Inc.*, ___ F. Supp. 3d ___, No. 2:23-CV-01455-TL, 2024 WL 3511033, at *10 (W.D. Wash. July 23, 2024) (quoting *Panag v. Farmers Ins. Co. of Wash.*, 166 Wash. 2d 27, 37, 204 P.3d 885 (2009)). While the CPA "'does not define the term 'deceptive,' the implicit understanding is that 'the actor misrepresented something of material importance.'" *Id.* (quoting *State v. CLA Estate Services, Inc.*, 23 Wash. App. 2d 279, 291, 515 P.3d 1012 (2022)). A plaintiff does not have to show actual deception or intent to deceive; an act is deceptive if it had "'the capacity to deceive a substantial portion of the public.'" *Ride the Ducks Seattle LLC v. Ride the Ducks Int'l LLC*, No. C19-1408 MJP, 2023 WL 1099641, at *2 (W.D. Wash. Jan. 30, 2023), *appeal dismissed*, No. 23-35054, 2024 WL 3664649 (9th Cir. June 24, 2024) (quoting *Hangman Ridge*, 105 Wash. 2d at 785, 719 P.2d at 531).

The Court agrees with Amazon that the Complaint fails to adequately allege a deceptive act or practice.[13] Zulily's allegation that Amazon engaged in acts that deceived the public by "by falsely representing to consumers that its prices are the lowest and/or competitive" is conclusory. *See* Dkt. # 1 at 56 ¶ 237. For example, Zulily does not identify any representation Amazon made to consumers about its prices or the competitiveness of its prices. *See, e.g.*, *Shields*, 2024 WL 3511033, at *10 (on a Rule 12(b)(6) motion, the court determined that the complaint sufficiently alleged a deceptive act or practice because it identified a specific representation made by the defendant's employees to customers about automatic refunds while knowing that the company had received several complaints from other customers who had not received their refunds). Outside of alleging that Amazon "engaged in acts and practices that have the capacity to—and did—deceive a substantial portion of the public," the Complaint lacks "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Dkt. # 1 at 56 ¶ 237; *Iqbal*, 445 U.S. at 678. *See also Randy's Ring & Pinion Serv. Inc. v. Eaton Corp.*, No. C09-637Z, 2009 WL 10727790, at *9 (W.D. Wash. Nov. 16, 2009) (dismissing, on a Rule 12(b)(6) motion, the plaintiff's CPA claims because the complaint "does not specifically identify any unfair or deceptive trade practice other than those alleged in the antitrust claims"). Thus, the Court grants Amazon's motion as to the deceptive-acts-or-practices claim under the CPA.

[13] In its Motion, Amazon also argues that the "alleged deceptive harm has no overlap with the harm Zulily allegedly suffered." Dkt. # 25 at 28 n.13. Amazon contends that to state a claim under Washington's CPA, a plaintiff must allege that "additional plaintiffs have been or will be injured. . .*in exactly the same fashion*." *Id.* (emphasis in original) (quoting *Buffets, Inc.*, *v. Klinke*, 73 F.3d 965, 970 (9th Cir. 1996)). Because the Court dismisses the claim for failure to adequate allege a deceptive act or practice, it need not address this issue.

F. Leave to Amend

Leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). It should be given absent "any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment etc." *In re Tracht Gut, LLC*, 836 F.3d 1146, 1151–52 (9th Cir. 2016) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "'In dismissing for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Yagman v. Garcetti*, 852 F.3d 859, 863 (9th Cir. 2017) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)). The Court grants Zulily leave to file an amended complaint as to the hub and spoke conspiracy to restrain trade claims under federal and state law and the claim for deceptive acts or practices under Washington's CPA.

**IV**

**CONCLUSION**

For the above reasons, the Court GRANTS in part and DENIES in part the motion to dismiss:

- The Court DENIES Amazon's request for dismissal on antitrust standing grounds.
- The Court GRANTS Amazon's request under Rule 12(b)(6) as to the hub and spoke conspiracy to restrain trade claims under federal and state law. The Court DISMISSES the claims without prejudice.
- The Court GRANTS Amazon's request under Rule 12(b)(6) as to the deceptive-acts-or-practices claim under Washington's CPA. The Court DISMISSES the claim without prejudice.

- The Court otherwise DENIES Amazon's requests under Rule 12(b)(6).

The Court GRANTS Zulily leave until January 31, 2025, to file an amended complaint; such leave is limited to the claims dismissed without prejudice here.

Dated this 31st day of December, 2024.

John H. Chun
United States District Judge